**PISTORINO & CO., INC.**

v.

**UNITED STATES.**

C.D. 4763; Court No. 73–12–03391.

United States Customs Court.

Aug. 29, 1978.

Doherty & Melahn, Boston, Mass. (Walter E. Doherty, Jr., Boston, Mass., of counsel), for plaintiff.

Barbara Allen Babcock, Asst. Atty. Gen., Washington, D. C. (Edmund F. Schmidt, trial attorney, New York City), for defendant.

MALETZ, Judge:

This case involves the proper tariff classification of merchandise invoiced as "Acupuncture Dolls (Models)" which were manufactured in and exported from the People's Republic of China and entered at the port of Boston in January 1973. Plaintiff Pistorino & Co., Inc. was the customs broker and the consignee was Sobin Chemicals, Inc.[1]

The importation consists of a kit containing a three dimensional scaled-down twenty-inch figure of a human male; a replica of a human hand also scaled down in size; a replica of a human ear; and a 36-page manual. The kit is imported in a cardboard box upon which is printed the following: "MODEL OF A HUMAN BODY SHOWING CHINESE ACUPUNCTURE POINTS AND THE COURSES OF MERIDIANS." The figure, hand and ear are crafted in soft vinyl with 361 acupuncture points and 14 longitudinal lines or meridians marked in bright colors. The acupuncture points are further identified with arabic numerals which are keyed to the 36-page manual.

1. Sobin Chemicals, Inc. is now a division of International Minerals & Chemical Corporation.

The imported merchandise was classified by the government under item 737.15 of the Tariff Schedules of the United States (TSUS), as other models and assessed duty of 70% ad valorem—the column 2 rate for products of Communist countries. Plaintiff claims that the imported merchandise consists of "charts" within the meaning of TSUS and the proper classification should, therefore, be under item 273.35 which is a duty-free provision.

The pertinent provisions of TSUS read as follows:

Classified under:

Schedule 7, Part 5, Subpart E: Col. 2

Model trains, model airplanes, model boats, and other model articles, all the foregoing whether or not toys; and construction kits or sets for making or assembling such model articles:

\* \* \* \* \* \*

Other models, and construction kits or sets:

\* \* \* \* \* \*

737.15 Other . . . . . . . . . . . . . 70% ad val.

Claimed under:

Schedule 2, Part 5:

Part 5 headnotes:

1. Except for decalcomanias, labels, flaps, and bands, all of which are covered by the provisions therefor in this part, regardless of the nature of the printing thereon, this part covers only printed matter consisting essentially of textual or pictorial matter produced by any printing process, and similar matter in manuscript or typewritten form. The text may be set forth in any language by means of any kind of characters. With the exceptions above indicated, this part does not cover any article in which printing is merely incidental to the primary use of the article or in which printing is employed mainly for coloration or to produce a decorative or novelty effect (see part 4 of this schedule).

\* \* \* \* \* \*

273.35 Maps, atlases, and charts (except tourist and other literature provided for in item 270.70) . . . . . . Free

Against this background, plaintiff contends that the importation is not classifiable as a model but rather is more than a model. It further contends that the tariff provision for models is limited to inanimate objects and does not include animate figures such as those in issue. And finally, according to plaintiff, the importation is within the common meaning of the word "chart." Defendant, on the other hand, maintains that the importation falls within the common meaning of the word "model."

## I

The record consists of the testimony of three witnesses for the plaintiff, seven plaintiff exhibits, the testimony of two witnesses for the defendant and 14 defendant exhibits.[2]

The record shows that in 1972 Mr. Sobin purchased the importations in Canton, China for Sobin Chemicals, Inc. These importations (which in his testimony Mr. Sobin referred to as "acupuncture manikins" and as "models") were used in teaching acupuncture to students; in determinations by surgeons and anesthetists as to where acupuncture needles should be inserted to anesthetize the patient; and in acupuncture clinics to inform patients where and how acupuncture needles were to be inserted.[3]

2. The witnesses for plaintiff were: (1) Julian M. Sobin, who at the time of importation was president of the consignee, Sobin Chemicals, Inc. of Boston, Mass., a firm which imported chemicals and allied products from all over the world; (2) Dr. Tsu-Liang Hsu, a thoracic surgeon who received his medical degree and acupuncture experience in Taiwan; and (3) Terry Hardy, an employee in the retail sales division of J. L. Hammett Company, an educational supply firm which sells maps, medical charts, globes and graphs to grade schools, high schools and colleges, but not to professional schools such as medical schools.

The witnesses for the defendant were: (1) Jerome Glickman, director of the Educational Media Support Center at the Boston University School of Medicine, who was employed as a medical illustrator and whose doctoral thesis was on the effectiveness of individual three-dimensional models in teaching biology and anatomy; and (2) Dr. William McNary, an associate professor of anatomy at the Boston University School of Medicine.

3. According to the record, acupuncture is the treatment of disease by inserting very fine needles into the body at specific points called loci. In 1958 or 1959 acupuncture was used to produce analgesia for surgical operations and

The record further shows that about 10,000 kits were imported by Sobin Chemicals, of which some 1,500 were sold by it principally to doctors and researchers in the field of acupuncture. Sobin Chemicals never sold the kits to the general public, although it advertised them in the medical edition of *Time* magazine in September 1973. Stanley Marcus, of Neiman-Marcus Company of Dallas, Texas, also imported about 200 of these kits which were offered to regular Neiman-Marcus customers at $90.00 per kit for gift purposes; however, only 43 were sold.

It is to be observed that the record is replete with exhibits and testimony which consistently refer to the imported figures in the kits as "models" and the kits as "model kits." Indeed, plaintiff's witnesses themselves, in the course of their testimony, frequently referred to the imported figures as "models."

It is in this setting that we consider the testimony of plaintiff's expert witness, Terry Hardy, who, as previously indicated, was employed in the retail sales division of J. L. Hammett Company, an educational supply firm. The witness had some experience in selling topographical maps, medical charts, and globes. According to the witness, the imported figures—through three-dimensional—were "charts." The basis of his opinion was that the article "reminds me of looking like a chart because of the lines that accompany it." (R. 98) The witness further testified that in his opinion the imported figures would be models save for the lines or meridians appearing thereon. It is to be added that the catalogue of the witness' company, the J. L. Hammett Company, designates all three-dimensional structures contained therein as "models" and all flat two-dimensional figures as "charts." In this connection, Mr. Hardy's attention was directed to a figure listed in the Hammett company catalogue as a "Torso Model." He testified that the fact that this figure came with an accompanying 56-page manual did not preclude it from being a "model" because, in his words, "[i]t's not made as a chart, it's not sold as a chart." (R. 86) Finally, in Mr. Hardy's opinion, the longitudinal lines or meridians and points were placed on the figures here in issue by a printing process, although Mr. Hardy conceded he had no actual knowledge of the process used.

Defendant's first expert witness, Jerome Glickman, who, as previously mentioned, was director of the Educational Media Support Center at the Boston University School of Medicine, testified that he used various models as teaching and reference sources and that in his experience anatomical models (such as those of the heart or brain) are "models" even though they might contain anatomical numbering and labeling, etc., none of which are found in nature.

He defined the term "model" in the following way (R. 110):

> * * * a model * * * is defined as a three-dimensional object that represents a physical object that may or may not be present; that the surface and form of that model should be similar to the original but its dimensions and composition of the material may differ.

He defined a chart as (R. 110):

> * * * a two-dimensional display prepared on a flat surface to display the anatomy. It has no dimensional quality to it except as created by the artist in rendering form.

In Mr. Glickman's opinion, the imported articles are "models." He testified that anatomical models often have lines on them and that the presence of lines in no wise precludes the articles from being models. He further stated that the lines on the

---

since that time it is reported that thousands of major operations have been performed with the use of acupuncture with patients remaining conscious, yet insensitive to pain throughout the operative procedure. Acupuncture points and meridians are not visible on the human body, although they have a certain reality to

them. While they do not follow arteries and veins in the body, they do have a relationship to the nerves of the body. The points guide the acupuncturist as to where acupuncture needles are to be inserted in a patient in order to affect the proper nerves for the purpose intended.

figures were hand drawn as evidenced by the visual presence of brush marks and the thickening and thinning of the lines—all of which, he indicated, are characteristic of hand application.

On cross-examination, Mr. Glickman was questioned repeatedly on whether a chart is used to "chart something traveling from one place to another." (R. 126) In this regard he noted that the flow of blood, for example, can be understood by referring to either a chart or a model. The witness stated that a model can be used for the same purposes as a chart but that such use does not make a model a chart because "we are talking about two different things." (R. 127)

Mr. Glickman went on to testify that he had seen so-called three-dimensional "charts." These, however, were only partially three-dimensional in that they had flat surfaces which had raised features, such as the raised cartography of a map showing the elevation of mountains, etc. On this aspect, the witness testified on cross-examination as follows (R. 132–3):

Q. In other words, if an article had all of the characteristics of a chart, of a flat chart, except that it was in addition a three-dimensional object, the mere fact that it's three-dimensional would not take it out of the chart category, would it?—A. Yes. I believe it would be in the model category.

Q. You say there is no such thing as a three-dimensional chart?—A. Not to my knowledge. We classified that a raised bas-relief model could be a three-dimensional chart, yes.

Defendant's second expert witness was Dr. William McNary, an associate professor of anatomy at the Boston University School of Medicine. He testified that in his opinion the imported figures are models and not charts. He stated that the lines and points on the imported articles do not alter the fact that they are models and not charts. Further, in his opinion, the imported articles are not "more than" models. He indicated that the lines were put on the figures for illustrative purposes and one would not

expect to see those lines on a human being. Models, he said, do not have complete accuracy and may have something on them that does not exist in the original. In fact, the witness stated that he had seen models of human lungs upon which lines have been drawn, adding that models of hearts, skulls and other parts of the human anatomy are not necessarily true representations of the human anatomy, but are models nevertheless.

Dr. McNary did not agree with the testimony of Mr. Glickman with regard to three-dimensional charts. In Dr. McNary's opinion, any object which has a three-dimensional quality—even if not complete—would be a model and not a chart.

## II

Turning now to the legal aspects, it is fundamental that tariff terms are to be construed in accordance with their common meaning. It is equally fundamental that common meaning is a question of law to be determined by the court and that in determining common meaning, the court may consult dictionaries, lexicons, the testimony of record, and other reliable sources of information as an aid to its knowledge. See, e. g., Sturm, *A Manual of Customs Law* (1974), pp. 204–6.

Applying these principles, the record is persuasive in establishing that the importations are commonly known as "models." For one thing, the advertisements, catalogues, manuals and trade literature covering the importations consistently refer to them as "models." For another, the exporters and Neiman-Marcus which retailed the importations to the general public also referred to them as "models."

Beyond that, the imported merchandise is included within the dictionary definition of the term "model." Thus, *Webster's Third New International Dictionary* (1963) defines a model as follows:

* * * 6 a. ɔ usu. miniature *three-dimensional representation* of something existing in nature or constructed or to be constructed. * * * b. a *representa-*

*tion* in relief or three-dimensions * *. [Emphasis added.]

Persuasive also is the expert opinion of the government's two witnesses who agreed that the importations are commonly known as models and not charts. This opinion was buttressed by the numerous catalogue exhibits of companies selling anatomical or biological models, which exhibits invariably referred to three-dimensional articles as models and to two-dimensional articles as charts.

Nor can we agree with plaintiff's contention that the importations are "more than" models. In this connection, plaintiff asserts that the imported articles are used to "convey information" and to do so the manual is a necessary adjunct to the intended use of the imported figures. Thus, plaintiff insists that the use of the merchandise as a guide in locating the acupuncture points on the human body makes it more than a model.

■ However, item 737.15 is an *eo nomine* provision and not a use provision. E. g., *Sawers v. United States*, 285 F.Supp. 852, 60 Cust.Ct. 593, C.D. 3467 (1968). Moreover, there is nothing about the use of the merchandise which would make it either "more than" a model or "other than" a model. The expert testimony has shown that (1) it is chiefly the dimensional quality of an article which distinguishes between models and charts; (2) the lines on a model in no way change the characteristics of the merchandise from a model to a chart; (3) anatomical models with lines on them are quite common; (4) models do not have to have complete accuracy with the object being represented; and (5) models and charts are frequently used for the same purpose (e. g., to show the flow of blood). Thus, the fact that the importations have lines and points on them does not cause the merchandise to be "more than" or "other than" a model.

To like effect, it must be concluded that the manual which is imported and used with the imported figures does not preclude the merchandise from being classified as a model. Plaintiff contends that the use of the manual as a reference source is similar to that of reference key codes or cards used with marine charts in marine navigation and in that way attempts to support its contention that the importation is a "chart." However, the record contains numerous examples of similar key codes, manuals or cards being used as a reference source with anatomical models. Indeed, even plaintiff's expert witness Mr. Hardy acknowledged that the "Torso Model" manufactured by his company was a model notwithstanding that it came with a 56-page manual. In short, the use of a reference manual in conjunction with the importations is not a distinguishing factor which would render the articles either charts or models.

Furthermore, plaintiff did not separately invoice the manual, nor does it claim that the manual is separately classifiable. The use of the imported manual is clearly subordinate to the function of the model and is reminiscent of an instruction or operational manual accompanying many products. In any event, plaintiff's argument would, at best, merely require the manual to be separately classifiable. Plaintiff has made no such claim and the classification of the manual in no way affects the classification of a three-dimensional model.

Finally, on this point, it is to be noted that if we were to follow plaintiff's reasoning and find that the manual renders the importation "more than" a *model*, we would similarly have to find that the importation is "more than" a *chart*, thus defeating plaintiff's affirmative claim. *Cf. Trans-Atlantic Co. v. United States*, 471 F.2d 1397, 1399, 60 CCPA 100, 103, C.A.D. 1088 (1973).

■ Plaintiff next argues that the model provisions are limited to models of *inanimate* objects. The argument is without merit. The previously cited dictionary definition refers to models as being representative of "something existing in nature," under which animate objects would obviously be included. So too, in the recent decision in *Lohzin & Born, Inc. v. United States*, 79 Cust.Ct. 34, 41, C.D. 4710 (1977), the court found that the term "model" as it is used in

the tariff schedules would include a miniature representation of a thing which "need not be an exact or accurate representation of something in existence; it is sufficient if it is more than a crude form of a class of articles and recognizably represents an article that existed in fact or legend."[4] There can be no doubt that such definition includes models of animate as well as inanimate objects.

 Nor do we find any merit to plaintiff's reliance on the theory of *ejusdem generis* in this regard. First, the common meaning of the term "model" can be ascertained without resorting to this rule. For it is well settled that this rule may not be invoked to narrow, limit or circumscribe an enactment and it is never applied if the intention of the legislature can be ascertained without resort thereto. See *Sandoz Chemical Works, Inc. v. United States*, 50 CCPA 31, 35, C.A.D. 815 (1963). Secondly, the rule is not applicable and certainly would not limit the scope of item 737.15 to models or model articles of inanimate objects. While plaintiff points out that items 737.05 through 737.15 "appear to consist of inanimate objects," it nonetheless offers no authority for its contention that Congress intended to limit item 737.15 to models of inanimate objects. In fact, if this court were to adopt plaintiff's limited construction of the model provision, it would also preclude the classification of imported models similar to a host of anatomical and biological models depicted in the trade catalogues as models. This is exactly the type of arbitrary distinction sought to be eliminated by the tariff schedules. Finally, the plain language of item 737.15 fails to indicate any Congressional intent to distinguish between models of animate and inanimate objects. As the court said in *Hudson Shipping Co., Inc. v. United States*, 75 Cust.Ct.

26, 34, C.D. 4606 (1975), "it is apparent that item 737.15 * * * makes no distinction as to the types of models * * * but encompasses *all* models * * * (not otherwise specifically provided for) * * *." [Emphasis added.]

### III

Not only has plaintiff failed to demonstrate that the government's classification of the importations under item 737.15 as models is incorrect, plaintiff has also failed to prove its affirmative claim that the importations are properly classifiable under item 273.35 as charts. The latter provision, it is to be noted, is limited by headnote 1, schedule 2, part 5, which (as previously indicated) provides as follows:

1. Except for decalcomanias, labels, flaps, and bands, all of which are covered by the provisions therefor in this part, regardless of the nature of the printing thereon, *this part covers only printed matter consisting essentially of textual or pictorial matter produced by any printing process*, and similar matter in manuscript or typewritten form. The text may be set forth in any language by means of any kind of characters. With the exceptions above indicated, *this part does not cover any article in which printing is merely incidental to the primary use of the article or in which printing is employed mainly for coloration* or to produce a decorative or novelty effect (see part 4 of this schedule). [Emphasis added.]

In view of this headnote, plaintiff's claim for classification under item 273.35 as charts must be rejected for the reason without more that it failed to present any probative evidence that the imported merchandise was *printed* matter consisting essentially of textual or pictorial matter produced by a printing process.

---

4. We reject plaintiff's contention that a model must consist of merchandise used for the making or building of something. This contention is based upon the decision in *United States v. American Brown Boveri Electric Corp.*, 17 CCPA 329, T.D. 43776 (1929). Plaintiff ignores the fact that this decision interpreted a *use* provision for a particular type of model under paragraph 1620 of the Tariff Act of 1922. The

TSUS not only broadened the tariff classification for models but also provided *eo nomine* for models. There is no statutory basis for plaintiff's claim that item 737.15, TSUS, is limited to only models used for the making or building of something. (See e. g., *Lohzin & Born, supra*, which involved preassembled decorative sailing ship models.)

Mr. Glickman provided the only credible testimony of record on the question whether this merchandise was produced by any printing process. The witness testified that the meridian lines on the figures were *hand drawn*. Thus, plaintiff has failed entirely to meet its burden of proving that the merchandise was produced by a printing process.

Finally, plaintiff contends that the three-dimensional quality of the importations does not prevent them from being charts. In support of this contention, it relies on *United States v. Buffalo Society of Natural Sciences*, 15 Ct.Cust.Appls. 1, T.D. 42128, 51 Treas.Dec. 535 (1927) and *University of North Carolina v. United States*, 63 Treas. Dec. 1072, T.D. 46462 (1933). The *Buffalo* case involved models of plants and animals. The *University of North Carolina* case involved a globe of the world. In each case, the models were held to be classifiable as charts under paragraph 1530 of the Tariff Act of 1922, which provided that:

> Any society or institution incorporated or established solely for religious, philosophical, educational, scientific, or literary purposes, or for the encouragement of the fine arts, or any college, academy, school, or seminary of learning in the United States, or any State or public library, may import free of duty any book, map, music, engraving, photograph, etching, lithographic print, or chart, for its own use or for the encouragement of the fine arts, and not for sale, under such rules and regulations as the Secretary of the Treasury may prescribe.

A plain reading of the decisions in *Buffalo* and *University of North Carolina* reveals that they rest solely upon the public policy behind the then paragraph 1530 of the Tariff Act of 1922. As the court stated in *Buffalo*, 15 Ct.Cust.Appls. at 4:

> Paragraph 1530 obviously was intended to extend the benefits and advantages of free entry to goods intended, *inter alia*, for educational purposes. In so doing, the Congress had in mind the public welfare. It is our duty to give this paragraph a liberal construction in order to further that purpose. * * *

These cases are clearly distinguishable from the present case for several reasons: First, in both the cited cases, the goods were imported by an institution incorporated solely for educational purposes, and the goods were imported only for the use of the institution. In the present case, by contrast, the merchandise was imported specifically for sales purposes and was not used solely for educational purposes. Thus, the public policy considerations applicable in the cited cases are entirely inapplicable here. Second, at the time both cited cases were decided there were no specific provisions for models such as contained in item 737.15, and neither case involved competing provisions for models and charts.

For all the foregoing reasons, plaintiff's claim is overruled and judgment will be entered dismissing the action.