CLIPPER BELT LACER CO., INC., Plaintiff,

v.

UNITED STATES, Defendant.

Court No. 85-08-01032.

United States Court of International Trade.

March 13, 1990.

Edmund Maciorowski, P.C., Edmund Maciorowski, for plaintiff.

Stuart M. Gerson, Asst. Atty. Gen., Washington, D.C., Joseph I. Liebman, Atty. in Charge, Intern. Trade Field Office, Commercial Litigation Branch, Civil Div., U.S. Dept. of Justice, Mark S. Sochaczewsky, New York City, for defendant.

## OPINION AND ORDER

CARMAN, Judge:

Plaintiff, Clipper Belt Lacer Co., Inc. (Clipper) contests the denial of its protest filed under section 515 of the Tariff Act of 1930 as amended. 19 U.S.C. § 1515 (1988). The imported merchandise, fasteners used to splice together the sections of belting used on belt conveyors, was classified by the United States Customs Service (Customs) as other "articles of iron or steel, not coated or plated with precious metal" under item 657.25 of the Tariff Schedules of the United States (TSUS). Clipper claims the articles are best described as "Staples in strip form ..." under TSUS item 646.20. Alternatively Clipper asserts the merchandise should be classified as "staples" constructed of two or more pieces under TSUS item 646.32 or as parts of "belt conveyors" under TSUS item 664.10.

After careful examination of the evidence presented at trial, the arguments of the parties, the tariff schedules and the relevant case law, the Court concludes Clipper has failed to overcome the presumption of correctness attaching to Customs' classification of the belt fasteners. The merchandise was properly classified as other "articles of iron or steel, not coated or plated with precious metal" under item 657.25 TSUS. Judgment will enter for the defendant United States (the government) dismissing this action.

Classified Under:
 Schedule 6, Part 3, Subpart G (1983):
 Articles of iron or steel, not coated or plated with precious metal:

 Other articles:

 Other:

| 657.25 | Other | 5.7% ad val. |

First Alternative Claim Under:
 Schedule 6, Part 3, Subpart D (1983):

| 646.20 | Staples in strip form | 0.9% ad val. |

Second Alternative Claim Under:
 Schedule 6, Part 3, Subpart D (1983):
 Brads, nails, spikes, staples, and tacks, all the foregoing, not described in the foregoing provisions of this subpart, of base metal;
 Of iron or steel.

| 646.32 | Of two or more pieces | 2.3% ad val. |

Third Alternative Claim Under:
 Schedule 6, Part 4, Subpart B (1983):
 664.10 Elevators, hoists, winches, cranes, jacks, pulley tackle, belt conveyors, and other lifting, handling, loading, or unloading machinery, and conveyors, all the foregoing and parts thereof.

 Parts of the foregoing:

| Other | 2.0% ad val. |

---

## FACTS

The merchandise in issue consists of metal items referred to commercially as hooks, lacings, fasteners or splices, that are primarily used to attach or splice together pieces of the belts used in a belt conveyor system. The primary purpose of the splices is to create an endless belt. A belt conveyor is the machine that propels the endless belt around bearings and idler pulleys, transporting the material positioned on top of the belt from one point to anoth-

**532**

er. Common examples of conveyor systems utilizing endless belts include conveyors used at supermarket check-out counters, baggage handling systems at airports and package sorting conveyors used by commercial parcel post services. Heavier industrial uses of belt conveyors include filtering sludge slurry, baling hay or transporting raw minerals such as coal or mineral ores.

By way of background, the articles under consideration are sometimes referred to as belt lacings because historically the two ends of a belt were joined together with a leather lace, much like a shoe is laced and tied. The machines used to hold the two ends of the belt in place and install the lacings were referred to as "belt lacers." Though leather lacings have long since become obsolete, replaced in some cases by more sophisticated and durable metallic devices, the terms have endured.

Clipper domestically produces a line of light-weight belt lacings, but neither manufactures nor sells conveyors or conveyor belts. The imported merchandise in issue here consists of two models of metallic belt lacings or belt fasteners, the Ultra and the Mato [see attached figure], which are collectively referred to by Clipper as the "Mato Line." Testimony established that these two models are used to splice together the belting used on heavy duty belt conveyors, of the type primarily used in the coal mining industry.

For each lacing model, the Ultra and Mato, exemplars were placed into evidence at trial consisting of the individual fasteners, fasteners attached together by a common metal bar and fasteners embedded into the edge of a polyvinyl chloride or rubber two- or four-ply belt. Additionally, two other exhibits consisted of finished versions of the Ultra and Mato fasteners as they would appear after installation.

Fig. A (bottom left) is the Mato model;
Fig. B (top right) is the Ultra model.

The Ultra model consists of an integral "U" shaped wire form consisting of two legs, supported by a curved crown (which is designed to carry a load) and ground point profiles. Two short pointed wires are resistance-welded to the legs. The articles are collated in rows of 14, held together by a common, non-functional bar that allows the introduction of the lacings or belt fasteners into the belt lacer as a unit.

The Ultra incorporates two grooves whose function is to accept the points from the opposite end of the hook once they have been pressed through the belt carcass by the belt lacer and bent over. The grooves allow the bent points to be recessed thereby creating a low profile for the overall splice. Each individual Ultra fastener is constructed of four pieces: the U-shaped wire form, the two short wire points and the common bar.

The Mato model, a somewhat heavier gauge fastener than the Ultra, is stamped and formed from steel plate, resulting in a rectangular stock item six millimeters wide and 60 millimeters long that is bent and shaped into the form of a "U". Eight holes are punched into the ends of the plate (four on each end) and two U-shaped wire forms with ground point profiles at each end (identical in appearance to heavy gauge staples) are press-fitted into four of the holes at one end of the plate. Like the Ultra, individual fasteners are collated and held together by a common non-functional bar.

Grooves are coined into the plate in line with the eight holes, allowing the point profiles to bend back flush with the plate upon installation by the belt lacer. Similarly, the leading edge of the plate is coined to provide a "ramp" or taper to the plate, which allows the splice to move around the pulleys and through the conveyor scraper [1] with a minimal amount of catching or jamming. The Mato is constructed from four pieces of metal: the plate, the two wire forms and the common bar.

At trial plaintiff demonstrated the actual lacing of two belt ends together. To com-plete a splice, a row of fasteners or lacings are pressed through one piece of the belt carcass. The protruding ground point profiles are bent over, thus creating a channel of metal loops the width of the belt carcass. When attached to the belt, the metal loops have even spaces between them. Another set of fasteners is also installed on to the other piece of belt carcass. The two sets of looped channels, one set protruding from the edge of each belt carcass, are butted together, overlapped into the spaces between the individual loops. The overlap creates a tube-like configuration the width of the belt. The splice is secured by a metal "pin" (a braided piece of wire) inserted into the tube created by the fastener overlap, preventing the two fastener sets from uncoupling.

These two belt fasteners, the Ultra and the Mato, are used almost exclusively in the coal mining industry to create endless belts for the conveyors used in transporting coal ore to the surface from mine shafts and tunnels. A typical conveyor belt of this type is up to four feet wide and one thousand yards to two miles in length. The belts are driven by large 150–200 horsepower motors and are made endless by the installation of belt fasteners at intervals of up to 250 feet. Due to the unique characteristics of each coal mine, the belts are generally installed and spliced at the site, both as original equipment and to repair damaged, worn or torn belts. It was determined at trial that while a belt conveyor must incorporate some type of belt fastener or lacing process for it to function, there is no requirement that the belt fasteners in issue be used. Indeed, belts can also be made endless by the process of vulcanization or gluing, or through the use of other mechanical splices.

Customs classified the Ultra and Mato model lacings as other "articles of iron or steel, not coated or plated with precious metal" under item 657.25, TSUS. Clipper timely filed a protest, which was denied and this action ensued.

---

1. A scraper operates like a brush or squeegee, sweeping any residual or excess material off the conveyor belt at the point where the material is discharged.

## DISCUSSION

A presumption of correctness exists in favor of Customs' classification of an imported product and the burden of proof rests upon the party challenging the classification. 28 U.S.C. § 2639(a)(1) (1982); *Jarvis Clark Co. v. United States*, 733 F.2d 873, 878, *reh'g denied*, 739 F.2d 628 (Fed.Cir.1984). This presumption of correctness pertains not only to Customs' final classification, but also to every element necessary to support that determination. *United States v. New York Merchandise Co. Inc.*, 58 CCPA 53, 58, C.A.D. 1004, 435 F.2d 1315, 1318 (1970); *Schott Optical Glass, Inc. v. United States*, 82 Cust.Ct. 11, 15, C.D. 4783, 468 F.Supp. 1318, 1320, *aff'd*, 67 CCPA 32, C.A.D. 1239, 612 F.2d 1283 (1979). In order to determine whether Customs' classification is correct, this Court must consider Customs' classification both independently and in comparison with the plaintiff's alternatives. *Jarvis Clark*, 733 F.2d at 878.

It is well settled that tariff acts must be construed to carry out the intent of the legislature. *Nippon Kogaku (USA), Inc. v. United States*, 69 CCPA 89, 92, 673 F.2d 380, 382 (1982); *Sandoz Chemical Works, Inc. v. United States*, 43 CCPA 152, 156, C.A.D. 623 (1956). The first place to look to establish the intent of Congress is the language of the statute itself. *Consumer Product Safety Comm'n v. GTE Sylvania, Inc.*, 447 U.S. 102, 108, 100 S.Ct. 2051, 64 L.Ed.2d 766 (1980). "Absent a clearly expressed legislative intention to the contrary, that language must ordinarily be regarded as conclusive." *Id.; see also Madison Galleries, Ltd. v. United States*, 870 F.2d 627, 630 (Fed.Cir.1989). The meaning of a particular tariff term is a question of law, while the determination of whether a particular article fits within that meaning is a question of fact. *Hasbro Indus., Inc. v. United States*, 879 F.2d 838, 840 (Fed.Cir.1989); *Stewart–Warner Corp. v. United States*, 748 F.2d 663, 664–65 (Fed.Cir.1984); *Daw Indus., Inc. v. United States*, 714 F.2d 1140, 1141–42 (Fed.Cir. 1983). Disputed meanings of a word in a tariff provision are resolved by ascertaining the common meaning of the word, from its commonly received and popular sense. *Schott Optical*, 82 Cust.Ct. at 16, 468 F.Supp. at 1321; *Trans–Atlantic Co. v. United States*, 60 CCPA 100, 102, C.A.D. 1088, 471 F.2d 1397, 1398 (1973); *United States v. Rembrandt Electronics, Inc.*, 64 CCPA 1, 5, C.A.D. 1175, 542 F.2d 1154, 1156 (1976). To determine the common meaning, in addition to relying upon its own understanding of the terms used, the Court may consult dictionaries, lexicons, the testimony of record, and other reliable sources of information as an aid to 'its knowledge. *United States v. C.J. Tower & Sons*, 44 CCPA 1, 4, C.A.D. 626 (1956); *Pistorino & Co., Inc. v. United States*, 81 Cust.Ct. 37, 41, C.D. 4763, 461 F.Supp. 331, 334 (1978), *aff'd*, 66 CCPA 95, C.A.D. 1227, 599 F.2d 444 (1979); *Schott Optical*, 82 Cust.Ct. at 16, 468 F.Supp. at 1321.

### I. Staples

The common meaning of a tariff term is determined by the meaning it had at the time of enactment of the tariff act. *United States v. Brager–Larsen*, 36 CCPA 1, 3–4, C.A.D. 388 (1948); *Davies Turner & Co. v. United States*, 45 CCPA 39, 41, C.A.D. 669 (1957). It does not fluctuate even if the words subsequently become inured with different meanings in common speech. *United States v. Victoria Gin Co., Inc.*, 48 CCPA 33, 37, C.A.D. 759 (1960).

The parties agree this case is governed by the TSUS provisions of the Tariff Classification Act of 1962, enacted on May 24, 1962. Pub.L. No. 87–456, 76 Stat. 72 (1962).

Clipper contends the belt fasteners are properly considered "staples" within the meaning of TSUS items 646.32 and 646.20 and the dictionary definitions of "staple" in effect in 1962. Clipper points to the following definitions of staple relied on by the court in *Hal Marks & Assocs. v. United States*, 59 Cust.Ct. 202, 207, C.D. 3123, 273 F.Supp. 527, 531 (1967):

Webster's New International Dictionary of the English Language, second edition (1957)—

staple, n. * * * 2. A loop of iron, or a bar or wire, bent and formed with two points to be driven into wood, etc., to hold a hook, pin, or the like; also a similarly shaped piece of thin wire, driven through papers, etc., and clinched to bind them.

\* \* \* \* \* \*

Funk & Wagnalls New "Standard" Dictionary of the English Language (1956)—

staple, n. 1. Mech. (1) A U-shaped piece of metal made by bending a small bar or wire and pointing the ends: often driven into wood, to serve as a fastening or part of a fastening by receiving the eye of a hasp, the point of a hook, the end of a bolt, etc. * * *

Clipper contends the Mato and Ultra qualify as staples within the meaning of *Hal Marks*, contending the fasteners were shown to be made of U-shaped wire or bar steel and equipped with points designed to pierce and clinch in a prescribed fashion, creating an opening allowing for the insertion of the "pin" or "bolt" and designed to bind together the ends of a conveyor belt. The crux of Clipper's claim is that the imported belt lacings are industrial fasteners, which, while somewhat modified in form to adapt to usage with belts and conveyors, nevertheless fall within the *eo nomine* provision for staples.

The government also relies upon the definitions set out in *Hal Marks* to contend the imported belt fasteners do not fall within the common meaning of the term staples because they have more than two piercing points, are fashioned from more than one piece of metal and are not driven into two or more articles. Additionally, the government claims the *Tariff Classification Study*, Schedule 6 (1960), evinces the intent that item 646.32, TSUS, only covers merchandise previously assessed as upholsterer's nails and that belt fasteners were not contemplated.

The imported article in issue in *Hal Marks* was a metal "conduit staple" shaped like the numeral "7" with the horizontal portion arc-shaped rather than straight. It was used to fasten or hold a pipe secure to a wall—the curved section wrapped around the pipe; the other end was driven into the wall. The Court, reasoning as follows, concluded that the article did not fall within the common meaning of staple:

From the foregoing definitions it is evident that, for an article to be included within the common meaning of the word "staple", it must be a loop or U-shaped piece of metal, both ends of which have been pointed, and be used as a fastener when driven into wood or other material.

*Hal Marks*, 59 Cust.Ct. at 207, 273 F.Supp. at 531.

Following the court in *Hal Marks*, this Court holds the belt lacings in issue do not fall within the common meaning of the term "staple" as understood at the time of the enactment of the Tariff Classification Act of 1962 and used in TSUS items 646.20 and 646.32.

Though it is clear that the lacings are used to fasten material together (viz. the belts), neither the Ultra nor the Mato are accurately described as a loop or U-shaped piece of metal, with two pointed ends. Disregarding the non-functional bar for the moment, the Ultra and Mato each contain at least two components that could loosely be described as loop or U-shaped, but the entire articles cannot be said to be loop or U-shaped. Additionally, while both articles contain pointed pieces of metal, there are more than two pointed "ends" to these metal pieces.

The Ultra is constructed of one piece of wire, bent in at least six places, with both ends coming to points. This piece of wire is roughly loop or U-shaped, though its configuration does not comport with that of an ordinary U-shaped staple. Two other shorter wires with points at the ends are welded to the longer bent wire so that the four points of the three wires are on the same plane, capable of resting on the same surface. The result is an article of looped wire that appears as though it terminates in two U-shaped pointed wires. In this Court's view, an article with two U-shaped loops and four points, created by two short pointed wires welded to a longer pointed U-shaped wire that is bent in at least six

places, does not fall within the common meaning of the term staple.

As concerns the Mato model, the conclusion must be the same. The Mato essentially consists of a rectangular plate of steel with four holes punched into each end of the plate. The plate is bent over so that the four holes on one end of the plate roughly align with the four holes on the other end, allowing pointed wires to be guided through both ends of the plate and bent over, thereby binding the lacing to the belt carcass. Neither end of the plate itself is formed into a point. On one end of the plate the four holes are press-fitted with what can only be described as two conventional staples (a U-shaped wire with both ends pointed). Thus the Mato is really comprised of three looped or U-shaped pieces of metal, one made of steel plate, the other two of wire, of which only the two wires are pointed at the ends. This article cannot be said to fall within the common meaning of staple.

 While it is clear to this Court that the Mato and Ultra are fasteners in a generic sense, they are clearly not staples within the meaning of the Tariff Schedules.[2] This conclusion is further reinforced by Clipper's sales catalog wherein the fasteners are referred to as hooks, lacings, and fasteners, but not as staples. Plaintiff's Exhibit (P.Ex.) 13. Clipper's own witnesses primarily referred to the lacings as hooks or fasteners, not staples, though one witness characterized the article as "industrial type staples."

 Even if the Court were to agree that the belt fasteners are commonly referred to as staples by the relevant industry, that fact alone does not mandate their classification as staples. It is not enough that an article be called a tariff term in the trade vernacular. There must also be a showing made that the article embodies the salient characteristics of the tariff term claimed. See, e.g., United States v. Andrew Fisher Cycle Co., Inc., 57 CCPA 102, C.A.D. 986, 426 F.2d 1308 (1970) (tariff term "saddle" did not encompass bicycle seat, even though commonly and commercially known as saddles); J.E. Bernhard Co. v. United States, 81 Cust.Ct. 60, C.D. 4766 (1978) (articles used to set proper pitch for guitars not encompassed by tariff term "tuning pins"). Clipper has failed to meet this burden.[3]

 Additionally, the Court rejects Clipper's claim that the Mato Line of lacings fall within the scope of the eo nomine provision for staples as a new and improved, subsequently created article. Clipper relies upon the principle that an eo nomine provision without limitation in a tariff act includes all forms of the article, even when it comes into existence at a date subsequent to the enactment of the tariff provision. Nootka Packing Co. v. United States, 22 CCPA 464, 470, T.D. 47464 (1935); Davies Turner, 45 CCPA at 41. In general an improved version of the original article, even one incorporating additional features or capabilities, may still be classified as a subsequently created article, provided it falls within the scope of the eo

---

**2.** Examination of the *Tariff Classification Study* of 1960, Schedule 6, at 187 clarifies that Congress did not intend TSUS item 646.30 to encompass all fasteners, but rather a narrowly defined type of fastener derived from articles previously classified as upholsterer's nails.

**3.** In seeking to determine the common meaning of staple, this Court finds it unnecessary to consult technical dictionaries or lexicons, since for tariff classification purposes Congress is presumed to have intended the common meaning of a word to be synonymous with its commercial meaning absent a contrary indication. *See, e.g., ITT Thompson Indus., Inc. v. United States,* 3 CIT 36, 47, 537 F.Supp. 1272, 1280 (and citations therein), *aff'd without opinion,* 703 F.2d 585 (Fed.Cir.1982). The burden of overcoming the presumption rests squarely upon the party asserting it. *See Rohm & Haas Co. v. United States,* 727 F.2d 1095, 1097 (Fed.Cir.1984); *United States v. Simon Saw & Steel Co.,* 51 CCPA 33, 38, C.A.D. 834 (1964).

Clipper's claim, based upon inconclusive evidence, that the relevant industry currently perceives the belt fasteners in issue as "industrial staples," without more, is insufficient to establish that the commercial meaning of the term staple in the tariff schedules is other than the common meaning as relied upon herein.

Additionally, since the belt fasteners do not fall within the common meaning of the term "staple" the court need not separately address whether the imported articles are "Staples in strip form" under TSUS item 646.20.

*nomine* provision. *Sears, Roebuck & Co. v. United States*, 46 CCPA 79, 82, C.A.D. 701 (1959); *United Carr Fastener Corp. v. United States*, 54 CCPA 89, 91, C.A.D. 913 (1967) (citations therein); *FAG Bearings, Ltd. v. United States*, 9 CIT 227, 228, 1985 WL 25762 (1985) ("An *eo nomine* classification includes all articles subsequently created which fairly come within its scope.") (citing *Sears, Roebuck & Co.*, 46 CCPA at 82). Nevertheless, in sum, the subsequently created article must still bear a close resemblance to the article named in the tariff schedule. *United States v. Standard Surplus Sales, Inc.*, 69 CCPA 34, 38, 667 F.2d 1011, 1014 (1981).

■ This argument is of no avail to Clipper, since, as this Court found above, the belt lacings as a whole do not fall within the scope of the term staple as defined by the common meaning of the TSUS items in issue. This Court rejects the argument that the Mato and Ultra, as belt fasteners, are new and different forms of staples classifiable as subsequently developed variations of the *eo nomine* article "staple." [4]

## II. Belt Conveyor Parts

Clipper alternatively argues the belt fasteners are properly classified as parts of belt conveyors under TSUS item 664.10. In support, Clipper contends the Mato Line of belt fasteners are designed for and chiefly used as parts of belt conveyors; that once the fasteners are "affixed to the conveyor" they become a permanent operating component of the conveyor without which it could not operate, and; that the fasteners contribute to the safe and efficient operation of the belt conveyors. Application of General Interpretative Rule 10(ij), Clipper argues, requires the parts provision in TSUS item 664.10 for parts of belt conveyors to

prevail over the government's basket provision, TSUS item 657.25.

The government claims, on the basis of examination of the nature and function of the articles, that the fasteners are part of the belts to which they are affixed, not part of the belt conveyors. On this basis the government contends the fasteners cannot be classified as parts of belt conveyors under TSUS item 664.10 due to the invasive nature of Headnote 1(ii) of Part 4, Schedule 6, which explicitly excludes "belts and belting" from classification thereunder.[5] This position, the government argues, is not vitiated by the lack of language in the headnote excluding parts of belts and belting, or the lack of a parts provision in the TSUS items covering belts and belting (*see* TSUS items 358.02–16).

### A. Parts

The first issue the Court must examine is whether, as Clipper claims, the fasteners are properly considered parts of belt conveyors, not parts of belts or belting.

"It is a well-established rule that a 'part' of an article is something necessary to the completion of that article. It is an integral, constituent, or component part, without which the article to which it is to be joined, could not *function as such article*." *United States v. Willoughby Camera Stores, Inc.*, 21 CCPA 322, 324, T.D. 46,851 (1933) (emphasis in original), *cert. denied*, 292 U.S. 640, 54 S.Ct. 773, 78 L.Ed. 1492 (1934); *United States v. Antonio Pompeo*, 43 CCPA 9, 11, C.A.D. 602 (1955). In determining whether an item is a part of an article, the Court looks to the "nature, function, and purpose of an item in relation to the article to which it is attached or designed to serve...." *Ideal Toy Corp. v.*

---

**4.** The government argues that the Mato Line of belt fasteners cannot be subsequently developed articles encompassed within the *eo nomine* provision for staples because belt fasteners are not *new* at all. The government claims that fasteners used on belting were in existence before the 1962 Act, and Congress, presumed to have been aware of their existence when fashioning the tariff schedules, also presumably accounted for them in the schedules. *See* Defendant's Post Trial Brief at 4, n. 3 (quoting *Audels New Mechanical Dictionary* (1960) defining belt fasteners to include hooks or lacings, but making no

mention of staples). This argument further undermines Clipper's position.

**5.** Headnote 1(ii) and (v) of Part 4, Schedule 6 (1983) provides as follows:

 1. This part does not cover—

 ....

 (ii) belts and belting

 ....

 (v) articles and parts of articles specifically provided for elsewhere in the schedules.

*United States*, 58 CCPA 9, 13, C.A.D. 996, 433 F.2d 801, 803 (1979); *Gallagher & Ascher Co., Inc. v. United States*, 52 CCPA 11, 13, C.A.D. 849 (1964); *New York Merchandise Co. v. United States*, 59 Cust.Ct. 306, 314, C.D. 3150, 273 F.Supp. 377, 383 (1967); *Beacon Cycle & Supply Co., Inc. v. United States*, 81 Cust.Ct. 46, 51, C.D. 4764, 458 F.Supp. 813, 817 (1978).

The rule set out in *Willoughby Camera* has been modified over the years so that a device may be a part of an article even though the device is not necessary to the operation of the article, provided that once the device is installed the article cannot function properly without it. To meet this test, the device must be dedicated for use upon the article. *See Beacon Cycle*, 81 Cust.Ct. at 50–51, 458 F.Supp. at 816–17; *and see, e.g., Antonio Pompeo*, 43 CCPA 9 (superchargers classified as parts of automobiles, not as machines not specially provided for); *Trans Atlantic Co. v. United States*, 48 CCPA 30, C.A.D. 758 (1960) (optional bracket for mounting door closer classified as part of door closer, not mounting, not specially provided for, suitable for doors); *Gallagher & Ascher*, 52 CCPA 11 (auxiliary heaters dedicated for use in Volkswagen automobiles determined to be parts of automobiles).

In *Gallagher*, the court found the relevant considerations to be as follows:

[W]hether a given article constitutes a part of another article depends upon the nature of the so-called part and, we might add, to some degree on the function and purpose of the so-called part in its relation to the article to which it attaches or with which it is designed to serve.

The decided cases do not clearly establish any set rule or principle for determination of what constitutes parts of automobiles. The particular merchandise itself must be considered in order to make a determination as to whether the imported merchandise falls within the purview of the parts provision herein involved. . . .

*Id.* at 13–14.

Examination of these factors leads this Court to conclude that the Mato Line of belt fasteners are properly considered parts of conveyor belts, not belt conveyors. Evidence showed that the primary function of the fasteners related to the belt itself, not the conveyor. The purpose of the belt lacings in issue, like all belt lacings, is above all to create an endless belt. Notwithstanding the existence of some design considerations relating to the fasteners' interaction with the conveyor and its parts, the lacings were designed primarily to effectuate lasting belt splices. When viewed as a whole, Clipper's evidence does not overcome the presumption that the merchandise was properly viewed by Customs as a part of belts or belting for classification purposes.

At the outset, the Court notes that when used, the Mato Line of fasteners are clearly attached to the belt, not the conveyor, and once joined to the belt they become an integral component of the belt, without which the belt could not operate. The conveyor, on the other hand, can function without the belt fasteners in issue, by utilizing an endless belt created by some other method such as vulcanization or gluing, or with another type of mechanical splice.

The choice of which fastener to utilize in creating an endless belt was shown to depend primarily upon the characteristics of the belt and the site, rather than the conveyor. The fasteners were shown to be designed to account for the width, thickness and tension rating of the belt. The make-up of the belt fastener, its construction and the method of its installation were all focused on effecting a secure bind of the fasteners to the belt. The stated purpose underlying these design characteristics was to reduce belt tearing, maintain belt tension and enhance belt longevity. Fastener interaction with the components of the conveyor, while played up by Clipper's witnesses, remained essentially a secondary consideration in this Court's view.

Evidence also appeared to show that the belts and belt fasteners moved in the same stream of commerce, while belt conveyors moved in separate channels. Additionally, there was testimony that belts were some-

times sold with Mato or Ultra belt fasteners already attached. This evidence tends to reinforce the conclusion that belt fasteners are designed to function primarily as parts of belts.

■ Clipper's own promotional literature clearly focuses the nature, function and purpose of the fasteners on the belts themselves, as opposed to the belt conveyors. While not determinative of the issue, Clipper's marketing profile can be of some probative value to this Court. *See Childcraft Education Corp. v. United States,* 742 F.2d 1413, 1416 (Fed.Cir.1984); *Montgomery Ward & Co. v. United States,* 62 Cust.Ct. 718, 724, C.D. 3853 (1969). The promotional literature clearly indicates Clipper targets an industrial clientele that utilizes belts.[6] The promotional literature concerning the Clipper–Mato Line of heavy duty fasteners similarly indicates that the primary design function relates to the durability of the splice itself in binding the belt, maintaining the belt strength and tension, and increasing the longevity of the belt and joint. P.Ex. 13 at 16. Secondarily, the literature refers to the fasteners' interaction with the conveyor itself, stating only that the "low fastener profile is easy on belt scrapers, idlers and pulleys, and contributes to its quiet operation." *Id.*

Clipper's expert witnesses did attempt to establish that belt fasteners were properly regarded as parts of belt conveyors. The bulk of the witnesses testimony at trial focused on the low profile of the Mato Line of fasteners and characteristics designed to reduce friction (jamming and catching) by minimizing fastener contact with the components of the conveyor. There was also some inconclusive testimony that the Mato Line of fasteners contributed to the safe use of belt conveyors. Overall, however, the witnesses' testimony failed to rebut the weight of the evidence establishing the belt itself as the critical design concern of the Ultra and Mato fasteners, or that their primary function was to maintain the integrity and strength of the splice creating endless conveyor belts.

After careful examination of the evidence the Court concludes the Mato and Ultra belt fasteners are part of the belt, not the belt conveyor.

### B. Headnotes

Having established that the lacings are truly *belt* fasteners, properly considered parts of belts or belting, the Court must determine whether Headnote 1(ii), which precludes classification of belts and belting under Part 4, operates to exclude the belt fasteners from classification as part of a belt conveyor under TSUS item 664.10, or whether the Customs' basket provision prevails.

Clipper claims that General Interpretative Rule 10(ij) governs this analysis. The rule provides: "a provision for 'parts' of an article covers a product solely or chiefly used as a part of such article, but does not prevail over a specific provision for such part." Clipper argues that this provision operates to include the belt fasteners under TSUS item 664.10 as parts of conveyors. Clipper, citing *American Shack Co., Inc. v. United States,* 1 CIT 1, 1980 WL 2228 (1980), relies upon the principle that a part of a part is classifiable as a part of the whole.

The government argues that since Headnote 1(ii) excludes belts and belting from classification under Part 4, Congress implicitly expressed its intention that parts of the belts should also be excluded from classification thereunder, including TSUS item 664.10. The government claims the invasive effect of the headnote operates to ex-

---

**6.** Plaintiff's Exhibit 13, a promotional catalog entitled "Clipper Fastening Systems, Innovative Belt Fastening Systems For Industry Worldwide" generally describes Clipper's overall corporate focus as follows:

> Because belting of some type is involved in virtually every industry, so are we. We provide fastening systems for factory installed new belts and for the repair of old ones. From small tapes and delicate belts used in electronic equipment, including computers, to heavy-duty belts for conveying operations in farm equipment and coal mining. And everything in between.
>
> Belts are expensive, and we're in business to protect your investment. We provide a system to fasten belts of all sizes and materials....

*Id.* at 1.

clude the imported article regardless of whether belt fasteners are determined to be parts of belts or parts of belt conveyors.

In construing the Tariff Schedules, the primary concern of this Court is to give effect to Congressional intent, and this requires reading all parts of the statute together, including the headnotes, which are the primary source for ascertaining such intent. *Lyons Export & Import, Inc. v. United States,* 59 CCPA 142, 146, C.A.D. 1056, 461 F.2d 830, 833 (1972); *Philipp Overseas, Inc. v. United States,* 84 Cust.Ct. 200, 203, C.D. 4859, 496 F.Supp. 273, 276 (1980), *aff'd,* 68 CCPA 43, C.A.D. 1263, 651 F.2d 747 (1981); *C.J. Tower & Sons of Buffalo, Inc. v. United States,* 68 Cust.Ct. 377, 379–80, C.R.D. 72–11, 343 F.Supp. 1387, 1390 (1972); *United States v. Patel,* 762 F.2d 784 (9th Cir.1985). Competing provisions of the tariff schedules, both of which appear to apply to the imported merchandise, must be harmonized by reading them in conjunction with the relevant headnotes and interpretative rules contained in the tariff schedules. *R.H. Macy & Co. v. United States,* 57 CCPA 115, 118, C.A.D. 988, 428 F.2d 856, 859 (1970); *Tuscany Fabrics, Inc. v. United States,* 59 CCPA 77, 83, C.A.D. 1043, 454 F.2d 1188, 1192, *cert. denied,* 409 U.S. 845, 93 S.Ct. 47, 34 L.Ed.2d 85 (1972). When in conflict with the relevant headnotes, rules of judicial interpretation must give way to the intent expressed in the headnote. *United States v. De Laval Separator Co.,* 65 CCPA 48, 51, C.A.D. 1204, 569 F.2d 1134, 1136–37 (1978).

The clear implication of Headnote 1(ii) is that the drafters of the tariff schedules intended that belts and belting not be classified as parts of belt conveyors (or as parts of any of the other machinery or mechanical equipment enumerated in Part 4 of Schedule 6). As determined above, belt fasteners are parts of conveyor belts; they do not become parts of belt conveyors until they are parts of the belts themselves. Since belts and belting are precluded from consideration as parts of conveyors for tariff classification purposes under Part 4 of Schedule 6, by virtue of Headnote 1(ii),

parts of belts cannot be classified within Part 4. This Court adopts this construction regardless of the absence of language in the headnote explicitly excluding parts of belts and belting from classification under Part 4, and regardless of whether a basket provision turns out to be the most specific alternative classification once classification within Part 4 is ruled out.

Prior case law has decided the pertinent legal principle at issue here in the context of TSUS item 666.00 covering agricultural implements and parts thereof.

In *Border Brokerage Co., Inc. v. United States,* 68 Cust.Ct. 7, C.D. 4325 (1972) the court held that parts of harvesting containers could not be classified under item 666.00, TSUS, as parts of agricultural implements, due to an exclusionary headnote barring classification of harvesting containers under that provision even though the provision for harvesting containers failed to include a parts provision. *Id.* at 10. The headnote in issue in *Border* (Headnote 1 of Schedule 6, Part 4, Subpart C) excluded from classification under item 666.00, TSUS, certain articles specially provided for elsewhere in the tariff schedules.

The court engaged in the following analysis:

[H]arvesting containers, which are specially provided for [under TSUS item 204.27], are ... excluded from classification as agricultural implements under item 666.00 by virtue of that provision's controlling headnote.

Parts of such containers, however, may not be similarly treated as item 204.27 has no provision for "parts". This brings us to the heart of the issue—whether parts of an article expressly excluded from classification under item 666.00 are nonetheless classifiable thereunder as parts of agricultural implements.

That question was raised in *C.S. Emery & Company, W.A. Gleeson v. United States,* 57 Cust.Ct. 217, C.D. 2767 (1966), involving wooden snaths, which are handles for scythes, assessed as tool handles of wood under item 206.54 and claimed to be dutiable as parts of agri-

cultural implements under item 666.00. Noting that "scythes" are dutiable under item 648.69, the court rejected this claim, holding ...:

> Item 666.00 provides for "agricultural and horticultural implements not specially provided for" and "parts of any of the foregoing." But by express provision of the headnote, and not just by relative specificity, certain farm articles provided for elsewhere (including scythes) are excluded from item 666.00. Parts of such expressly excluded articles are not "parts of any of the foregoing." Therefore, item 666.00 does not cover snaths which are parts of scythes, expressly excluded articles.

> We are in accord with the holding in *Emery* that parts of expressly excluded articles are not "parts of any of the foregoing" articles provided for in item 666.00.

*Border*, 68 Cust.Ct. at 10. *See also United States v. Western Oilfields Supply Co.*, 57 CCPA 130, 133, C.A.D. 992, 427 F.2d 1391, 1394 (1970) (citing to *Emery* with approval).[7] The court in *Border* upheld the classification of the merchandise under a basket provision for articles of wood not specially provided for.

The holding and reasoning of the court in *Border* and *Emery* apply equally to this case. TSUS item 664.10 covering belt conveyors, like TSUS item 666.00 covering agricultural implements, provides for "[p]arts of the foregoing." Like the scythes and harvesting containers in *Emery* and *Border*, belts and belting are excluded from classification in Part 4 by the headnote. Parts of belts and belting, like parts of scythes and harvesting containers, are not "[p]arts of the foregoing" articles enumer-

ated in TSUS item 664.10, and therefore they cannot be classified thereunder.

The invasive character of Headnote 1(ii) removes the need for this Court to apply General Interpretative Rule 10(ij) to the facts of this case since the relative specificity between two competing provisions is not implicated by the exclusion of the belt fasteners from classification under TSUS item 664.10 by virtue of Headnote 1.[8] The Court determines, therefore, the belt fasteners were properly classified under TSUS item 657.25.

## CONCLUSION

On the basis of the foregoing, this Court holds Clipper has failed to overcome the presumption of correctness attaching to Customs' classification. The merchandise was properly classified under TSUS item 657.25 as other articles of iron or steel, not coated or plated with precious metal. This action is dismissed.

---

**7.** *Cf. Costa Int'l Corp. v. United States*, 58 CCPA 48, 52, C.A.D. 1003, 434 F.2d 1053, 1055 (1970) (court held that the absence of the words "and parts thereof" in a headnote, which directed that "machine[s] or appliance[s]" covered by competing provisions be classified in the subpart, did not preclude articles described as parts of machines from mandates of headnote and classification in subpart).

**8.** Clipper's reliance upon *American Shack* is misplaced. There, the court, relying upon the

rule that a part of a part is a part for tariff purposes, ruled that parts of a hood exhaust system (itself a part of a furnace), designed exclusively for use in a particular furnace, were properly classified as parts of the furnace. As shown above, Congress, expressed an intention, in Headnote 1(ii), contrary to the general rule followed in *American Shack*. The expression of Congressional intent is paramount and controls this Court's analysis.