**SCHOTT OPTICAL GLASS, INC.**

v.

**UNITED STATES.**

**C.D. 4783; Court No. 72–6–01326.**

United States Customs Court.

Jan. 17, 1979.

or both surfaces . .. . but not further processed . . . [which is] colored or special . . . , measuring not over $^{15}/_{32}$ inch in thickness . . .," under item 543.61 of the tariff schedules. Under this claimed tariff item the merchandise would have been dutiable at the rate of 2.8 cents per square foot plus 2 percent ad valorem.

At the trial, however, and without objection from defendant, plaintiff amended its claim and substituted item 542.92, TSUS, for the previously claimed item 543.61. The plaintiff indicated that this change was based solely on whether the imported glass was ground or polished within the meaning of item 542.92, which provides for colored or special glass "in rectangles, not ground, not polished and not otherwise processed . . . ," dutiable at 0.7 cent per pound plus 2.5 percent ad valorem.

The question presented, therefore, is whether the imported merchandise was properly classified by the customs officials as optical glass under item 540.67, or whether it should have been classified, as claimed by plaintiff, as colored or special glass under item 542.92.

The following are the pertinent provisions of the tariff schedules:

"SCHEDULE 5. – NONMETALLIC MINERALS
AND PRODUCTS
Part 3. – Glass and Glass Products"

<u>Classified under:</u>

Subpart A:

"Optical glass in any form, including blanks for spectacle lenses and for other optical elements; non-optical-glass blanks for corrective spectacle lenses; synthetic optical crystals in the form of ingots, segments of ingots, sheets, or blanks for optical elements; all the foregoing not optically worked; polarizing material, in plates or sheets, not cut to shape or mounted for use as polarizing optical elements:

\* \* \* \* \* \*

540.67 Other optical glass and synthetic
 optical crystals; polarizing ma-
 terial ................... 40% ad val."

<u>Claimed by plaintiff under:</u>

Subpart B:

"<u>Subpart B Headnotes:</u>

\* \* \* \* \* \*

Barnes, Richardson & Colburn, New York City (Richard C. King, New York City, of counsel), for plaintiff.

Barbara Allen Babcock, Asst. Atty. Gen., Washington, D.C. (Robert B. Silverman, New York City and Madeline B. Cohen, Trial Attys., Washington, D.C.), for defendant.

RE, Chief Judge:

The question presented in this case pertains to the proper classification for customs duty purposes, of color filter glass imported from West Germany. As shown by the samples in evidence, the merchandise consists of pieces of glass which are 6½ inches square and colored. The colors of the glass include shades of red, green, blue, yellow and gray.

The colored glass was classified by the customs officials as "other optical glass and synthetic optical crystals; polarizing material," pursuant to item 540.67 of the Tariff Schedules of the United States [TSUS]. Consequently, it was assessed with duty at the rate of 40 percent ad valorem.

Initially, plaintiff contested the classification, and claimed that the colored glass should have been properly classified as "glass . . . ground or polished on one

2. For the purposes of this subpart—

\* \* \* \* \* \*

(c) the term 'colored or special glass' refers to glass that has a transmittance of normally incident light of less than 66 percent at one or more wave lengths from 400 to 700 millimicrons, inclusive, or a transmittance of less than 80 percent at one or more wave lengths from 525 to 575 millimicrons, inclusive, for glass ¼ inch in thickness, or of the equivalent transmittances for any other thickness, provided that, in determining such light transmittances, the effect of surface irregularities or configurations, or of other surface treatment (except flashing applied prior to solidification), and the effect of wire netting within the glass, shall be eliminated;

\* \* \* \* \* \*

Glass (whether or not containing wire netting), in rectangles, not ground, not polished and not otherwise processed, weighing over 4 oz. per sq. ft.:

\* \* \* \* \* \*

Colored or special glass:

\* \* \* \* \* \*

542.92 Weighing over 28 oz. per sq. ft.:
Not over 2⅜ sq. ft. in area ............... 0.7¢ per lb. + 2.5% ad val."

■ The court has concluded that plaintiff has failed to overcome the presumption of correctness which attaches to the defendant's classification. It is, therefore, appropriate to restate the well-established legal principles surrounding the presumption insofar as they pertain to the burden of proof in customs classification cases.

■ Congress, in 1970, enacted into statutory law (28 U.S.C. § 2635(a)), the previously well-settled principle of decisional law that, in any matter before the Customs Court, the decision of the Secretary of the Treasury or his delegate (here, the classifying official) is presumed to be correct, and that the burden of proving otherwise is upon the person challenging that decision.

■ The classifying official, as a matter of law, is presumed to have found the existence of every fact necessary to support the classification. *W. A. Gleeson v. United States*, 432 F.2d 1403, 58 C.C.P.A. 17 (1970); *Novelty Import Co., Inc. v. United States*, 53 C.C.P.A. 28, C.A.D. 872 (1966); *F. H. Kaysing v. United States*, 49 C.C.P.A. 69, C.A.D. 798 (1962). The presumption of correctness pertains not only to the ultimate conclusion of the classifying official, but also to every subsidiary fact necessary to support that conclusion. *United States v. New York Merchandise Co., Inc.*, 435 F.2d 1315, 58 C.C.P.A. 53 (1970). As observed by the United States Court of Customs and Patent Appeals in the *New York Merchandise Co.* case, the presumption of correctness serves the useful purpose of determining the extent of the importer's burden of proof.

■ To prevail, in a customs classification case, plaintiff must sustain its burden of proof, and overcome the presumption of correctness that attaches to the classification of the customs official. Authoritative case law leaves no doubt that to overcome this presumption, the plaintiff must prove that the customs classification was wrong, and that its claimed classification is correct. *United States v. New York Merchandise Co., Inc., supra; Technical Tape Corp. v. United States*, 55 C.C.P.A. 38, C.A.D. 931 (1968).

■ The presumption of correctness is overcome when plaintiff has discharged "the burden of persuading the trier of the fact of the nonexistence of the presumed fact." Morgan and Maguire, *Looking Backward and Forward at Evidence*, 50 Harv.L. Rev. 909, 913 (1937), cited in *Sanji Kobata et al. v. United States*, 326 F.Supp. 1397, 1407, 66 Cust.Ct. 341, 355 (1971). There can be no doubt, as indicated by the Court of Customs and Patent Appeals in the *New York Merchandise Co.* case, that the plaintiff must bear "the ultimate burden of persuasion." 435 F.2d 1315, 58 C.C.P.A. at 58. Chief Judge Markey, in the case of *Solder Removal Company and Jesse C. Hood v. United States International Trade Commission, etc.*, 582 F.2d 628, 633 (1978) stated that ". . . the burden of persuasion is and remains always upon the party assert-

ing invalidity . . . ." Although the question presented in that case pertained to the validity of a patent, the similarity between the presumption of validity of a patent under 35 U.S.C. § 282 and the statutory presumption of correctness as to actions of customs officials makes Chief Judge Markey's statement especially pertinent here.

Applying these principles to this case, the law presumes that the classifying official found every fact necessary to support the conclusion that the imported glass products were classified as optical glass. The principal dispute between the parties, or the issue presented for determination by the court, deals with the facts relevant to the classification of glass or a glass product as "optical glass," as that description is used in the tariff schedules.

 It is an established principle of customs law that if the meaning of a word in a tariff provision is in dispute, the correct meaning is to be determined from its common meaning, that is, from its commonly received and popular sense. *United States v. Rembrandt Electronics, Inc.*, 542 F.2d 1154, 64 C.C.P.A. 1 (1976); *Trans-Atlantic Company v. United States*, 471 F.2d 1397, 60 C.C.P.A. 100 (1973). What constitutes the common meaning of a tariff term is not a question of fact, but a question of law to be decided by the court. In ascertaining and understanding the common meaning of a tariff term, the court may consult dictionaries, scientific authorities and other reliable sources of information. *United States v. National Carloading Corp. et al.*, 48 C.C.P.A. 70, C.A.D. 767 (1961); *Trans-Atlantic Company v. United States, supra; Nomura (America) Corp. v. United States*, 299 F.Supp. 535, 62 Cust.Ct. 524 (1969), aff'd, 435 F.2d 1319, 58 C.C.P.A. 82 (1971).

This court and the United States Court of Customs and Patent Appeals have had occasion to interpret and apply the tariff definition of "optical glass." *Semon Bache & Co. v. United States*, 25 C.C.P.A. 239, T.D. 49339 (1937); *G.A.F. Corp., George S. Bush & Co., Inc. v. United States*, 67 Cust.Ct. 167, C.D. 4269 (1971); *Ednal Co., Inc. v. United*

*States*, 6 Cust.Ct. 552, Abs. 45423 (1941). Although *Semon Bache* and *Ednal* were decided under the provision for "optical glass" in the Tariff Act of 1930, plaintiff concedes that there is nothing in the legislative history to indicate any intention by Congress to change the definition of "optical glass" in the Tariff Schedules of the United States.

Plaintiff relies heavily upon the *Ednal* case in support of its position. It characterizes the issue in *Ednal* as relating "almost entirely to the question of whether or not the refractive index of the glass was known or specified." However, as the defendant correctly points out, plaintiff's reliance upon the *Ednal* decision is misplaced and its characterization of the issue upon which that decision turned is inaccurate.

In *Ednal* the imported glass was classified as "optical glass" dutiable at 50 percent ad valorem under paragraph 227 of the Tariff Act of 1930. Plaintiff claimed that it was properly dutiable at only $1\frac{26}{64}$ cents per pound under paragraph 219 of that act by virtue of T.D. 45313, as "sheet glass," not exceeding 150 square inches, by whatever process made and for whatever purpose used. Without indicating the nature of the evidence upon which it relied the court stated:

"The evidence offered by the plaintiff definitely shows that the glass in question does not exceed 150 square inches, and it is admitted that it is colored. It is also established by the evidence that the merchandise is not optical glass, as classified by the collector, but that it is sheet glass. The evidence shows, however, that the merchandise is used as photographic filters for cameras. That a camera is an optical instrument was held by the appellate court in *United States v. Bliss*, 6 Ct.Cust.Appls. 433, T.D. 35980." 6 Cust.Ct. at 552.

The court added:

"The only glass provided for in said paragraph for optical instruments or equipment is such glass as is used in the manufacture of lenses or prisms for optical instruments or equipment, and for that

purpose this glass is not used. The same is true with reference to 'optical parts.' A filter for a camera is not a lens or prism for a camera." 6 Cust.Ct. at 552–53.

The only authorities upon which the court apparently relied were the following definitions of optical glass:

"Optical glass is defined in Webster's New International Dictionary as follows:

Optical glass: An extra fine quality of flint or crown glass used for making *lenses, prisms*, etc.

Volume 10, page 417 of the Encyclopaedia Britannica defines optical glass as follows:

The term is usually regarded as applying to the highest qualities of glass used for telescopes, microscopes, *camera lenses* and scientific instruments of precision and not to spectacle lenses and pressed lenses for which inferior glass is used. (Italics ours.)" 6 Cust.Ct. at 553.

Immediately following these definitions the court set forth the following conclusion:

"Considering the fact that the instant merchandise is not used for making lenses of any kind, the above definitions strongly support the contention of the plaintiff that the merchandise is not optical glass, and that the collector was in error in classifying the merchandise as optical glass." 6 Cust.Ct. at 553.

Having been satisfied that the plaintiff had established a *prima facie* case, the *Ednal* court held that the merchandise in *Ednal* was improperly assessed at 50 percent ad valorem, and should have been assessed at the lower rate of duty.

The *Ednal* decision can have little if any precedential value. It contains no discussion of the evidence upon which the court concluded that plaintiff established a *prima facie* case. Furthermore, what is more important for present purposes, there is absolutely no reference or mention of refractive index and dispersion. Indeed, if any meaning is to be attributed to that brief decision it is that the court relied upon two lexicographical definitions which describe optical glass as glass of "extra fine quality" or possessing the "highest qualities."

In *Semon Bache*, the Court of Customs and Patent Appeals stated that the tariff provision for optical glass was intended to include glass "of very high quality . . such as is used for optical instruments." In amplification of this definition, this court, in the *G.A.F. Corp.* case, held that a glass product, in order to be classifiable as optical glass within the meaning of the TSUS provision for optical glass, must also be capable of performing an optical function, such as aiding human vision.

The plaintiff in *Semon Bache*, unlike the plaintiff in the present case, claimed that its imported glass products should have been classified as optical glass. The Court of Customs and Patent Appeals determined that the record failed to support plaintiff's claim that the imported products were optical glass within the common meaning of that term, particularly because the plaintiff failed to establish that the imported glass was of high quality, or that it was used for lenses or prisms in spectacles or quality optical instruments. The court discussed, but did not decide, the applicability of refractive index in determining whether a glass product was optical glass. It referred to plaintiff's brief which quoted from a publication entitled, "Glass Manufacture," that "optical glass has a refractive index range of 1.40 in one direction to 1.80 in the other direction." There was nothing in the record before the court in *Semon Bache* to show the refractive index of the imported glass.

Applying these authorities on the meaning of optical glass, and the effect of the presumption of correctness which attaches to the classifying officer's decision to the present case, it is presumed that:

(a) the imported glass articles are of very high quality;

(b) are used for optical instruments; and

(c) are capable of performing an optical function.

Plaintiff does not seriously dispute any of these presumptively correct findings of fact, whether ultimate or subsidiary. In-

deed, as cogently demonstrated by the analysis of the evidence in defendant's brief, plaintiff's evidence virtually concedes that its glass products are of very high quality such as are used in optical instruments, and are capable of performing an optical function. Furthermore, it is significant to note that in sales within the trade, plaintiff and distributors of plaintiff's imported glass products in issue characterize them as "optical glass" and "optical filters." Although plaintiff, in its brief, attempts to dismiss such descriptions as "an advertising point," or "mere puffing," the characterizations cannot be denied.

The court's study of the record, and its assessment of the competency and credibility of the several witnesses, make it abundantly clear and the court finds that:

(a) the importations are of a very high quality, i. e., they are homogeneous, and free from imperfections such as seeds, striae and bubbles;

(b) are used in optical instruments; and

(c) are capable of performing an optical function.

Plaintiff's own witnesses, for example testified that the imported glass products are used in spectrometers, and can be made into lenses or prisms. For classification of spectrometers as optical instruments, see TSUS item 711.86; *Tariff Classification Study: Explanatory Materials*, Vol. 2, pp. 555–56 (1964); *Summaries of Trade and Tariff Information*, Sched. 7, Vol. 2, p. 197 (1970). Plaintiff's evidence also indicates clearly that the addition of color to a glass product has no effect on the classification of glass as optical glass.

Plaintiff's principal contention is that the definition of optical glass, as set forth in *Semon Bache, G.A.F.*, and standard scientific authorities, is overly broad and not sufficiently specific. Essentially, it seeks to restrict the definition of optical glass.

Plaintiff argues that the criteria for optical glass must be expanded to include certain additional qualities which, of course, plaintiff then contends are not found in its imported glass products. Specifically, plaintiff contends that glass, in order to be classifiable as optical glass, in addition to the criteria previously mentioned, must have a refractive index and dispersion which meet exact specifications. Furthermore, plaintiff maintains that these specifications must be limited to a degree of four to six decimal points, and that the refractive index must be guaranteed. On this aspect of the case, the question presented is whether plaintiff has sustained its burden of proving, by a preponderance of the credible evidence, that the prerequisites for classifying a glass product as optical glass, include a "refractive index and dispersion which are known and controlled to very close tolerances."

The gravamen of plaintiff's case is twofold. Plaintiff must show, as a matter of law, that a refractive index and dispersion within "very close" tolerances are indispensable requirements of the statutory provision for optical glass. If successful, plaintiff must prove, as a matter of fact, that the imported articles do not possess those necessary requirements, and, therefore, do not satisfy the statutory standard.

■ The court has concluded that plaintiff has failed to sustain its burden of proof.

Plaintiff's evidence, in support of its argument on the very close tolerances permitted in the refractive index for optical glass, as compared with other glass, is at best ambiguous and uncertain. For example, in one place in its brief, plaintiff characterizes its witnesses' statements regarding the index of refraction and dispersion necessary for optical glass as "at least four decimal places for 'standard' optical glass." Yet, one of plaintiff's witnesses, Mr. William B. Alexander, testified that the tolerance for optical glass is "normally" stated to six decimal places. Mr. Alexander, at another point in his testimony, asserted that the refractive index for optical glass does not differ substantially from other glass, and its range can be "both high and low refractive indexes and everything in between."

Elsewhere in the record, Mr. Alexander agreed with a definition of optical glass found in the *International Dictionary of*

*Physics and Electronics* which made no mention whatever of a refractive index. Mr. Alexander, manager of new products for plaintiff, testified as follows on cross-examination:

"Q. Let me read the definition of the term 'optical glass' as defined in the International Dictionary of Physics and Electronics: 'Glass to be useful for lenses, prisms and other optical parts through which light passes, as distinguished from mirrors, must be completely homogeneous. This includes freedom from bubbles, striae, seeds, strain, etc.' Do you agree with that definition of the term 'optical glass'?—A. Certainly."

Mr. Alexander did not disagree with the definition of optical glass as described in the *Summaries of Tariff Information*, Vol. 2, Part 2, p. 102 (1948), but considered it to be "limited," even though this definition specifically mentioned the optical properties of refraction and dispersion. The definition of optical glass given in the *Summaries of Trade and Tariff Information*, Sched. 5, Vol. 4, p. 33 (1968), is similar to that given in the 1948 *Summaries*, except that the 1968 definition differentiates optical glass from nonoptical spectacle glass, specifically includes "high quality" as a characteristic of optical glass, and gives examples of optical instruments. It is significant that the definition in the 1968 *Summaries* also omits mention of refraction and dispersion properties.

Mr. Alexander said that glass is optical glass because of the existence of the refraction and dispersion properties stated in the definition of optical glass found in the 1948 *Summaries*. However, as indicated from the following extract from the record, in his personal view, he would put the refractive properties "on a higher plane than that definition does."

"Q. On the basis of your experience in using optical glass do you know what optical glass is?—A. Well, I would define it in terms of its desirable properties.

MR. KING: Your Honor, if I may read a definition of optical glass from the Summary of Tariff Information, 1948, on optical glass, paragraph 227, at page 102 of the Part 2 volume, it states: 'Optical glass is a clear glass which must meet precise specifications as to chemical composition, homogeneity, and freedom from physical defects. It may be classified into two groups or kinds, based largely on their use: (1) Instrument glass suitable for lenses or prisms in precision optical instruments, and (2) Ophthalmic glass suitable for use in spectacles. Each kind of glass is produced in many varieties which differ in their optical properties—refraction and dispersion.'

Q. Do you agree with this definition, Mr. Alexander?—A. Well, there is nothing to disagree with within it but the definition is limited because it misses the whole point of optical glass, or anyone desiring an optical glass, namely the refracting process."

Q. I believe it did state that each kind of glass has many varieties which differ in the optical properties or the refraction. Is that a sufficient statement of the importance of those properties, the mere fact that they exist?—A. Well, I would say the glass exists because you have to have these properties, so I would put it on a higher plane than that definition does."

Plaintiff called, apparently as an expert witnesses, Dr. Norbert J. Kreidl, professor of ceramic engineering at the University of Missouri. As may be gleaned from his testimony, Dr. Kreidl also offered his personal views, and what he described as his "own definition" of optical glass:

"To me optical glass means glasses which are made to control the refraction or bending power, and the fine characteristic of this bending power is independent of the wave length, which is called dispersion. The other properties that I mentioned are also indispensable but they are secondary in the sense that they do not always apply to any other property. In other words, an optical glass must have these first mentioned properties to me, but it is also required that it has to have qualities which, however, might have to be had by other products as well."

Dr. Kreidl did not disagree with the definition of optical glass taken from the *Encyclopaedia Britannica*, which specifies that optical glass, in addition to being free from imperfections, is obtainable "in a wide variety of optical properties" and must be available in "a wide range of refractive index."

"Q. Dr. Kreidl, I read to you from the Encyclopaedia Britannica, Volume 10 of the 1955 edition, on optical glass, at page 419B: 'Optical glass differs from other types of glass in two essential characteristics. The first of these is its freedom from imperfections, of which the most common are unmelted particles, commonly called stones; bubbles; and chemical inhomogeneity, which produces regions or streaks of differing refractive index called striae. The elimination of striae is the most difficult problem in the manufacture of optical glass. The glass must also be physically homogeneous and free from mechanical strain, which is effected by an annealing treatment under conditions determined by the composition of the glass. The second fundamental characteristic of optical glass is that it can be obtained in a wide variety of optical properties. For the manufacture of corrected lens systems, glasses must be available having not only a wide range of refractive index ($n_D$) but also of dispersion; and for many special cases there is required knowledge not only of the mean dispersion ($n_F–n_C$) but also of the partial dispersions ($n_D–n_C$, $n_F–n_D$, and $n_G–n_C$). These properties, and a quantity commonly given in optical glass catalogs is the V value [the combined formula for the V value is printed here]. Glasses are available having refractive index from 1.48 (fluor crowns) to 1.8 (extra dense flints) or even higher.' Would you agree with that definition doctor?—A. I do not disagree but the emphasis is entirely in the reverse order. I would take it and I use it in my own definition."

Dr. Kreidl testified as follows that the refractive index for optical glass may vary from three to six decimal places:

"For instance, the refractive index either has to be specified to the third decimal, has to be assured that from piece to piece the variation is not greater than that, but on request you can even demand that this variation is not greater than one in the fourth place within the same piece, the deviation should never be higher than one in the fourth place, but I can demand this deviation to be not higher than one in the sixth place."

Significantly, the definition of optical glass taken from the *Encyclopaedia Britannica*, with which Dr. Kreidl did not disagree, specifies that the refractive index for optical glass is from 1.48 to 1.8. As may be noted from the following testimony, plaintiff's witness, Mr. Alexander, testified that the imported glass has a refractive index from 1.49 to 1.6 which is well within the tolerance specified in the *Encyclopaedia Britannica*:

"Q. Is optical glass made with a refractive index that differs substantially from other glasses either higher or lower? —A. No, not really. There is a wide range. This includes both high and low refractive indexes and everything in between.

Q. Are you familiar with the refractive index of Schott's color filter glass?— A. Yes.

Q. Can you tell us what the range is?—A. Well, that range is from about 1.49 to about 1.6, total."

The court finds that plaintiff's evidence is replete with contradictions, inconsistencies and ambiguities. A statement of a witness, which is based solely upon his own opinion, and which is merely a conclusion of an ultimate fact in issue, has no probative value. *Keer, Maurer Company v. United States*, 46 C.C.P.A. 110, C.A.D. 710 (1959); *Brooks Paper Company v. United States*, 40 C.C.P.A. 38, C.A.D. 495 (1952); *Semon Bache & Co. v. United States*, 28 C.C.P.A. 166, C.A.D. 140 (1940).

Whether glass, in order to be classified as optical glass, must have the limiting and restricting qualities claimed by plaintiff, is a determination which depends upon the scientific and technical data presented. In

the case at bar, the decision of the court is based not only on the various authorities examined, but also upon its careful evaluation of the expert testimony of the witnesses. *See Ameliotex, Inc. v. United States,* 77 Cust.Ct. 72, 74, 426 F.Supp. 556, 557 (1976), *aff'd,* 65 C.C.P.A. ——, 565 F.2d 674 (1977).

Furthermore, even if the court were to accept plaintiff's argument that glass, in order to be classified as optical glass, must have a known refractive index, plaintiff concedes, and the evidence supports its concession, that the imported glass products do, in fact, have a known refractive index. This refractive index, upon the request of potential purchasers, will be given to two or possibly three decimal places.

Plaintiff also leaves entirely unanswered the question of the legal significance of the distinction between a refractive index known and specified to the third decimal, as contrasted with one known and specified to the fourth decimal. It has made some suggestion that the bending of light, as controlled by lenses or prisms, requires a fourth decimal refractive index. Plaintiff's position, however, was contradicted or undermined by the testimony of its own witnesses which shows that plaintiff's color filter glass can be made into lenses. The fact that plaintiff is able to quote refractive indexes to users upon request, as stated by plaintiff's witnesses, indicates clearly that the imported color filter glass possesses refraction and dispersion properties. Hence, on the basis of the presence or absence of these properties alone, it cannot be distinguished or removed from the category of optical glass.

Plaintiff suggests that the fact that it will specify but not guarantee the refractive index of the color filter glass distinguishes its merchandise from optical glass. However, assuming the necessity of refractive properties for optical glass, it presented no evidence which shows that the refusal to guarantee has any legal consequence or significance on the tariff classification of the imported glass.

One further question, raised at trial and not satisfactorily pursued by plaintiff, deals with the element of absorption. According to plaintiff's witnesses, absorption is the loss that light suffers when it passes through glass, i. e., different colors of glass are used selectively to absorb different wave lengths of light. Plaintiff's witnesses testified that absorption is an optical property. Plaintiff's witnesses also testified that in many of the uses of color filter glass, including use in optical instruments such as spectrometers, this glass was specifically employed for its absorption property. Plaintiff, however, did not indicate why high quality glass, used to perform the optical function of absorption in an optical instrument, should not be classified as optical glass irrespective of its refractive and dispersive properties.

Notwithstanding the able efforts of plaintiff's counsel, and the quantity of plaintiff's evidence, the court finds that plaintiff has not succeeded in restricting the tariff definition of optical glass by adding the additional requirements or properties that it has suggested. It has not proved that Congress intended a meaning for optical glass "so limited as to exclude the importation at issue." *Hayes-Sammons Chemical Co. v. United States,* 55 C.C.P.A. 69, 72, C.A.D. 935 (1968). See also remarks of Judge Rich in *United States v. A. Johnson & Co., Inc.,* 66 C.C.P.A. ——, C.A.D. 1218 (Dec. 7, 1978), on the importer's burden of proof.

It is important to note that the defendant did not merely rely upon the statutory presumption of correctness. It has submitted competent, reliable, and credible affirmative evidence, which the court has found persuasive, to support the presumption that the importations are within the common meaning of the provision for optical glass.

As witnesses, the defendant called Mr. Richard N. Mostrom, Mr. Robert C. Saxton, and Dr. Radu Mavrodineanu. Mr. Mostrom, who has a master of science degree in optical engineering from the Institute of Optics at the University of Rochester, is responsible for work direction in the area of optical systems and optical instrument design at Honeywell, Inc. He has used the

plaintiff's color filters in his work at Honeywell, particularly in the area of contrast enhancement of television systems. He has also used the filters in his previous work at the Delco Electronics Division of General Motors and at American Optical and Owens-Illinois. Mr. Saxton, employed by Corning Glass Works for 28 years, has spent the last nine years in the company's optical products department working entirely with color filter glass. Dr. Mavrodineanu, whose Ph. D. is in organic chemistry, is employed in the special analytical instrumentation section of the division on analytical chemistry of the National Bureau of Standards in Washington, D.C. He uses the plaintiff's color filters in his research and development work in high accuracy spectrophotometry and optical emission spectrometry.

These witnesses established to the satisfaction of the court that the glass filters manufactured by plaintiff, such as those imported in this case, are of very high optical quality, and are used in the production of optical systems, including optical lenses and lens systems in which uses they function optically. The testimony of defendant's witnesses also showed that color filter glass is one type of optical glass, and that the imported products are characterized within the optical glass industry as optical glass. Finally, the defendant's witnesses testified that the imported glass products are within standard definitions of "optical glass."

In view of the foregoing, it is the determination of the court that plaintiff's evidence is unconvincing, and is inadequate to overcome the presumption of correctness which attaches to the classification of the imported glass as optical glass.

After a careful study of the entire record, and the testimony of the witnesses in particular, it is the determination of the court that plaintiff has not succeeded in establishing that the imported glass products are not "optical glass" within the meaning of item 540.67 of the Tariff Schedules of the United States.

The protest is overruled, and judgment will be entered accordingly.