The **ADMIRAL DIVISION OF MAGIC CHEF, INC.**, Plaintiff,

v.

**UNITED STATES**, Defendant.

**Court No. 86–10–01342.**

United States Court of International Trade.

Dec. 28, 1990.

son, and Mary E. Gill, of counsel), for plaintiff.

Stuart M. Gerson, Asst. Atty. Gen., Joseph I. Liebman, Attorney in Charge, Intern. Trade Field Office, Commercial Litigation Branch, Civ. Div., U.S. Dept. of Justice (Kenneth N. Wolf, at trial; James A. Curley, on the brief), for defendant.

## OPINION AND ORDER

CARMAN, Judge:

This tariff classification case is before the Court for decision following trial. Plaintiff (Admiral) contests the denial of its protest filed under section 515 of the Tariff Act of 1930, as amended. 19 U.S.C. § 1515. This Court has jurisdiction pursuant to 28 U.S.C. § 1581(a).

For the reasons set forth herein, judgment will enter for the defendant United States dismissing this action.

## BACKGROUND

The imported merchandise, referred to interchangeably as defrost control timers or defrost timers, are devices used in refrigerators to regulate the cooling and defrosting cycles. The merchandise was classified by the United States Customs Service (Customs) as "time switches with watch or clock movements, or with synchronous or subsynchronous motors" under TSUS item 715.62. Alternatively, Customs asserts that the merchandise could be classifiable as "electrical switches" under TSUS item 685.90. Plaintiff counters that the imported merchandise is properly classified as parts of "refrigerators and refrigerating equipment, whether or not electric" under TSUS item 661.35.

Sonnenberg, Anderson, O'Donnell & Rodriguez (Paul S. Anderson, Michael A. John-

Below are the pertinent provisions of the tariff schedules:

Classified under:

Schedule 7, Part 2, Subpart E (1984):

> Times switches with watch or clock movements, or with synchronous or subsynchronous motors:

. . . .

715.62 Valued over $1.10 but not over
 $2.25 each ...................... 15¢ each + 10%
 ad. val. + 3.9%
 for each jewel,
 if any.

Customs alternative classification:

Schedule 6, Part 5 (1984):

685.90 Electrical switches, fuses, lightning arresters, plugs, receptacles, lamp sockets, terminals, terminal strips, junction boxes and other electrical apparatus for making or breaking electrical circuits, for the protection of electrical circuits, or for making connections to or in electrical circuits; switchboards (except telephone switchboards) and control panels; all the foregoing and parts thereof ...................... 6.5% ad. val.

Claimed under:

Schedule 6, Part 4, Subpart A (1984):

661.35 Refrigerators and refrigerating equipment, whether or not electric, and parts thereof ................. 3.7% ad. val.

---

## FACTS

The arguments presented at trial and the parties' respective post-trial briefs reveal the following undisputed facts.

The imported goods are devices that are used in refrigerators for regulating the cooling and defrost cycles. Comprised of several components, they make or break electric circuits by activating two sets of electrical contact points—one to disconnect the compressor (the cooling mechanism) and the other to connect the defrost heater. The articles are equipped with a synchronous or subsynchronous motor. The defrost timer disconnects the compressor by opening an electrical circuit after the compressor itself has run for a length of time predetermined by the manufacturer—six or eight hours depending upon the specification of the model. Upon completion of the compressor run cycle (and simultaneously with the compressor's disconnection) the defrost heater is activated and runs for a straight twenty-one or twenty-three minutes (again depending upon the model), as predetermined by plaintiff. The actual length of the compressor cycle generally cannot be predetermined because the compressor itself does not usually run continuously, but instead is activated or deactivated in response to variables such as room temperature, frequency of door openings, etc. The aggregate length of the cycle can vary by as little as six and as many as eighteen hours.

## CONTENTIONS OF THE PARTIES

Plaintiff contends that the defrost timers are not "time switches" within the meaning

of TSUS item 715.62, but should be properly considered parts of "refrigerators" or "refrigerating equipment" within the meaning of TSUS item 661.35. According to plaintiff, in order to be properly classified as a time switch under TSUS item 715.62, the defrost timers *must* be capable of performing each of the following functions: (1) measuring or indicating the time of day; (2) allowing the user to set it to operate at a particular time of day; (3) run continuously; and (4) have a dial or some mechanism to permit it to be set at variant times.[1]

Plaintiff contends that the legislative history of TSUS item 715.62, as found in the explanatory notes of the *United States Tariff Commission, Tariff Classification Study*, Schedule 7, at 167 (1960) (*Study*), which indicate that time switches classified thereunder "make or break electric circuits automatically at given times," directly supports its position that time switches must measure or indicate the time of day and be set to operate at a particular time of day. According to plaintiff, the drafters of the above *Study* intended that the language "at given times" mean "specific times of the day in terms of clock time, e.g. 3:15 P.M." Plaintiff further contends that in this context "given times" means those particular times of the day which the user could set according to her needs.

Plaintiff asserts that the defrost timers do not make or break electric circuits at predetermined times, but instead at variable times that do not correspond to clock time. The circuit making and breaking occurs in discontinuous intervals because the defrost timer's operation is dependant on and subject to electric power signals received from a thermostat. These signals can occur at any and all times of the day, depending upon the cooling needs of the refrigerator in which it is housed.

Defendant does not advance arguments challenging plaintiff's position that the defrost timers are parts of refrigerators but instead, relying upon Headnote 1(v) of Part 4 of Schedule 6, maintains that the merchandise is more specifically provided for under TSUS item 715.62.[2] Although defendant concedes that the compressor does not usually run continuously, it asserts that the defrost timer measures real time while the compressor is actually running. Conversely, the defrost timer will not run and therefore not measure time when the compressor is not running.

Defendant challenges plaintiff's assertion that the unpredictability with respect to the length of the compressor run cycle proves that the defrost timer does not open and close electric circuits at given or predetermined times. According to defendant, the defrost timer snaps open the switch to disconnect the cooling circuit when it has measured six hours of compressor run time and then snaps on the defrost circuit. Lastly, after the defrost timer has measured off a straight twenty-one minutes, representing the length of the defrost cycle, it will snap on the cooling circuit, thus completing the overall cooling and defrosting cycles.[3]

Defendant asserts that the weight of the authorities cited by plaintiff do not hold that a time switch *must* indicate the time of day, be equipped with a dial, run continuously, and operate at times dictated by the user. The case authorities cited by plaintiff, claims defendant, do not purport to establish a list of required components

---

1. Plaintiff cites several case authorities in support of this restrictive definition of time switch. *See, e.g., R.W. Cramer & Co. v. United States,* 62 Treas.Dec. 1055, T.D. 46456 (Cust.Ct.1934), *rev'd,* 22 CCPA 45, T.D. 47049 (1934) (electric automatic time switch has calibrated dials; user can determine time of day); *Morris Friedman v. United States,* 45 CCPA 99, C.A.D. 680 (1958) (time movements for locks contains dials).

2. Tariff Schedules of the United States Annot., Schedule 6, Part 4, Headnote 1(v) (1984). Headnote 1(v) provides that Part 4 of Schedule 6

(which encompasses Admiral's claimed classification) does not cover "articles and parts of articles specifically provided for elsewhere in the schedules." *Id.*

3. It appears from the record that the reason why the defrost cycle lasts for a *straight* or *continuous* twenty-one or twenty-three minutes of clock time as compared to the cooling cycle, which cannot be predetermined, is that only the cooling cycle is subject to interruption by the thermostat during its operation.

for time switches. Instead, those cases address only the particular time switches before them.

In the alternative, defendant argues that the subject defrost timer could be classified as an electrical switch under TSUS item 685.90. The Court now turns to a discussion of the legal authorities governing Customs' classification of imports under the Tariff Schedules.

## DISCUSSION

A presumption of correctness exists in favor of Customs' classification of an imported product and the burden of proof rests upon the party challenging the classification. 28 U.S.C. § 2639(a)(1); *Jarvis Clark Co. v. United States*, 2 Fed.Cir. (T) 70, 75, 733 F.2d 873, 878, *reh'g denied*, 2 Fed.Cir. (T) 97, 739 F.2d 628 (1984). This presumption pertains not only to Customs' final classification, but also to every element necessary to support that determination. *United States v. New York Merchandise Co. Inc.*, 58 CCPA 53, 58, C.A.D. 1004, 435 F.2d 1315, 1318 (1970); *Schott Optical Glass, Inc. v. United States*, 82 Cust.Ct. 11, 15, C.D. 4783, 468 F.Supp. 1318, 1320, *aff'd*, 67 CCPA 32, C.A.D. 1239, 612 F.2d 1283 (1979). In order to determine whether Customs' classification is correct, this Court must consider Customs' classification both independently and in comparison with the plaintiff's alternatives. *Jarvis Clark*, 2 Fed.Cir. (T) at 75, 733 F.2d at 878.

It is well settled that tariff acts must be construed to carry out the intent of the legislature. *Nippon Kogaku (USA), Inc. v. United States*, 69 CCPA 89, 92, 673 F.2d 380, 382 (1982); *Sandoz Chemical Works, Inc. v. United States*, 43 CCPA 152, 156, C.A.D. 623 (1956). The first place to look to establish the intent of Congress is the language of the statute itself. *Consumer Product Safety Comm'n v. GTE Sylvania, Inc.*, 447 U.S. 102, 108, 100 S.Ct. 2051, 2056, 64 L.Ed.2d 766 (1980). "Absent a clearly expressed legislative intention to

the contrary, that language must ordinarily be regarded as conclusive." *Id.; see also Madison Galleries, Ltd. v. United States*, 870 F.2d 627, 630 (Fed.Cir.1989). The meaning of a particular tariff term is a question of law, while the determination of whether a particular article fits within that meaning is a question of fact. *Hasbro Indus., Inc. v. United States*, 879 F.2d 838, 840 (Fed.Cir.1989); *Stewart–Warner Corp. v. United States*, 3 Fed.Cir. (T) 20, 22, 748 F.2d 663, 664–65 (1984); *Daw Indus., Inc. v. United States*, 1 Fed.Cir. (T) 146, 147–48, 714 F.2d 1140, 1141–42 (1983). Disputed meanings of a word in a tariff provision are resolved by ascertaining the common meaning of the word, from its commonly received and popular sense. *Schott Optical*, 82 Cust.Ct. at 16, 468 F.Supp. at 1321; *Trans–Atlantic Co. v. United States*, 60 CCPA 100, 102, C.A.D. 1088, 471 F.2d 1397, 1398 (1973); *United States v. Rembrandt Electronics, Inc.*, 64 CCPA 1, 5, C.A.D. 1175, 542 F.2d 1154, 1156 (1976). To determine the common meaning, in addition to relying upon its own understanding of the terms used, the Court may consult dictionaries, lexicons, the testimony of record, and other reliable sources of information as an aid to its knowledge. *United States v. C.J. Tower & Sons*, 44 CCPA 1, 4, C.A.D. 626 (1956); *Pistorino & Co., Inc. v. United States*, 81 Cust.Ct. 37, 41, C.D. 4763, 461 F.Supp. 331, 334 (1978), *aff'd*, 66 CCPA 95, C.A.D. 1227, 599 F.2d 444 (1979); *Schott Optical*, 82 Cust.Ct. at 16, 468 F.Supp. at 1321.

## TIME SWITCHES

Time switches found under TSUS item 715.62 carry an *eo nomine* designation.[4] An *eo nomine* designation, absent contrary intent by Congress or some conflicting administrative practice or judicial authority, includes all forms of the article. *Nootka Packing Co. v. United States*, 22 CCPA 464, 469, T.D. 47464 (1935). A court may examine the use to which the imported goods are put to aid its determination as to

---

4. "An *eo nomine* designation is one which describes a commodity by a specific name, usually one well known to commerce." 2 R. Sturm,

*Customs Law and Administration* § 53.2 (3rd ed. 1990).

whether they are embraced by the *eo nomine* designation. *United States v. Quon Quon Co.*, 46 CCPA 70, 73, C.A.D. 699 (1959).

◼ Time switches are not defined by the Tariff Schedule of the United States (1984). *See* Tariff Schedule of the United States, Schedule 7, Part 2, Subpart E, Headnotes 1–2 (1984). It is therefore necessary for this Court to examine the legislative history and other extrinsic sources to determine the common meaning of the subject merchandise.[5]

An examination of the *Study*[6] reveals that Congress intended that time switches under the TSUS 715.62 retain the definition accorded to those devices under paragraph 368(a) of the Tariff Act of 1930, the predecessor to TSUS 715.62. *Study, supra,* at 167; *see United States v. R.W. Cramer & Co.*, 22 CCPA 45, 48–49, T.D. 47049 (1934). The *Study* provides as follows:

> *Time switches*—Items 715.60 through 715.68 would continue without change the tariff treatment now accorded under paragraph 368(a) to time switches. These articles are designed primarily to make or break electric circuits automatically at given times, and are used to control lighting and heating circuits, pumps, etc.

*See Study, supra,* at 167.

Another relevant source of legislative history cited by the parties is the explanatory notes to the Brussels Nomenclature.[7] *Customs Cooperation Council, Explanatory Notes to the Brussels Nomenclature 1955* 1111–12 (1964) (*Brussels Nomenclature*). It provides in relevant part as follows:

> 91.06—TIME SWITCHES WITH CLOCK OR WATCH MOVEMENT (INCLUD-

ING SECONDARY MOVEMENT) OR WITH SYNCHRONOUS MOTOR.

> This heading covers devices which do not have the character of clocks of heading 91.04, but are mainly designed to make or break electric circuits automatically at given times, usually at times determined according to a previously established daily or weekly programme. To be included in this heading these devices **must have** a movement of the watch or clock type (including secondary or synchronous motor clock movements) or a synchronous motor with or without reduction gear.

> Time switches are used for the control of lighting circuits (for public places, shop-windows, staircases, illuminated signs, etc.), heating circuits (water heaters, etc.), cooling installations, pumps, two-rate electricity supply meters, etc. They consist essentially of a mechanical or electric movement of the watch or clock type or a synchronous motor, usually a dial with or without hands, a time-regulating device (levers and pins), together with systems of driving relays, switches and commutators. The whole is enclosed in a case with terminals. The dial is usually marked in hours and sometimes also in the days and months; levers or pins around its periphery actuate the contact devices at the desired times.

> Time switches may be set in action by thermostats, pressure regulators, water level regulators, etc.

*Id.* (emphasis in original).

At trial, plaintiff introduced various technical lexicons in support of its narrow definition of time switches. For instance, the *McGraw–Hill Encyclopedia of Science and Technology* 40 (6th ed. 1987) defines a time switch as a device that "runs continu-

---

5. The common meaning of an *eo nomine* designation is determined by the meaning it had at the time of enactment of the tariff act. *United States v. Brager–Larsen*, 36 CCPA 1, 3–4, C.A.D. 388 (1948); *Davies Turner & Co. v. United States*, 45 CCPA 39, 41, C.A.D. 669 (1957).

6. The *Tariff Classification Study* has been recognized as part of the legislative history of the Tariff Act. *Rifkin Textiles Corp. v. United*

*States,* 54 CCPA 138, 141, C.A.D. 925, *cert. denied,* 389 U.S. 931, 88 S.Ct. 294, 19 L.Ed.2d 283 (1967).

7. "The Brussels Nomenclature has been considered a proper source of legislative history where the statute is ambiguous and the *language of the two are similar.*" 2 R. Sturm, *Customs Law & Administration* § 52.2, at 18 (3rd ed. 1990).

ously and opens and closes electrical contacts at preset instants of time." Another technical manual defines a time switch as "a 24–hr. timing device of the type generally used to open and close electric circuits according to the time of day, on a continually repeating schedule." *Process Instruments and Controls Handbook* 17–126 (D.M. Considine ed. 1974).

 Despite plaintiff's assertions that time switches must run continuously, have a dial, indicate the time of day, and be capable of being set by the user, this Court finds no definitive evidence in the record or in the sources cited that Congress intended those characteristics to be present in a device in order for it to qualify as a time switch within the meaning of TSUS 715.62.[8] The technical, scientific definitions of time switches introduced by plaintiff are not controlling. Tariff terms generally "are not drafted in terms of science, but in the language of commerce, which is presumptively that in common use." *Hummel Chemical Co. v. United States*, 29 CCPA 178, 183, C.A.D. 189 (1941). The Court finds that the common, ordinary meaning of a time switch somewhat broader, as reflected by the following definition found in *Webster's Third New International Dictionary* 2395 (1986): "an electric switch that automatically operates at a set time."

The pivotal legal question before the Court, therefore, is the meaning of predetermined, given, or set times in the context of *when* time switches are deemed to make or break electric circuits within the meaning of item 715.62, TSUS. As discussed, such an inquiry first requires an analysis of the treatment accorded paragraph 368(a) of the Tariff Act of 1930, the predecessor of item 715.62, TSUS.

Paragraph 368(a), which provided for "any mechanism, device, or instrument intended or suitable for ... performing any operation or function at a predetermined time or times[,]" has been found to cover

an electric automatic time switch. *R.W. Cramer & Co.*, 22 CCPA at 48–49. In *Morris Friedman v. United States*, 45 CCPA 99, C.A.D. 680 (1958) the court attempted to decipher the meaning of predetermined or given times under paragraph 368(a) in the context of a timing device generally used in connection with a bank vault lock. The court first drew a distinction between paragraph 367, which provided for time keeping or time measuring devices, and paragraph 368(a), which provided for devices that recorded, indicated, or performed some function at a predetermined time. It then concluded that paragraph 368(a) was intended by the legislature to cover devices other than those solely considered "time keeping" or "time measuring":

It seems clear, therefore, that Congress must have intended the 'predetermined time (etc)' provision of paragraph 368 to embrace something *different* from that included in the provision for 'timekeeping, time-measuring, or time-indicating' devices, while recognizing that the two provisions could, in certain cases, equally cover a given device (as evidenced by the exception to paragraph 368). The involved provisions must be interpreted with this in mind.

[T]he minimum requirement for a timekeeping, measuring or indicating device is that it shall be capable, in normal use, of showing how much time has passed since or remains before some particular time or event.

*Id.* at 103 (emphasis added). Further, the *Morris* court recognized that paragraph 368(a) did not require devices classified thereunder to have dials or measure the time of day:

There are various ways in which a single device may serve to keep, measure or indicate time and to perform some function at a predetermined time. Time-

---

**8.** It is furthermore interesting to note that the *Brussels Nomenclature* does not *require* that time switches indicate the time of day, be capable of adjustment by the consumer, run continuously or be equipped with dials. *Brussels Nomenclature, supra,* at 1112–12. Instead, that

document states that time switches are "usually" equipped with dials that are "usually marked in hours". Moreover, the *Tariff Classification Study* is silent with respect to these characteristics.

keeping, measuring or indicating may be the primary function of such a device, as in alarm clocks, or it may have varying lesser degrees of importance, as in clock-thermostats and devices such as electric oven timers which serve primarily to do something after a predetermined time, but which also include a dial and a pointer to show how much of that time has passed or remains. It would seem that all the instruments above referred to could properly be considered to be time-keeping, measuring or indicating devices, since they are definitely designed to mark the passage of time and have at least one part which performs no other function.

. . . .

Finally, there are devices which perform a function at a predetermined time, but in which *the operating parts are concealed so that the device would not normally convey any information as to the passage of time.* The instant devices are of that character since, as testified by one of appellant's witnesses, 'you would have to be locked in the vault once it was closed to see if it [the device] was wound up.' While the record does not show how such a device would be placed when used in a burglar alarm system, it seems evident that it would operate principally, if not solely, at times when the building to be protected was unoccupied, and could thus serve no time-keeping, measuring or indicating function in the sense in which we believe those words were used by Congress.

*Id.* at 103–04 (emphasis added).

In sum, it appears that the *Morris* court contemplated devices under paragraph 368(a) for which a dial or some other time-measuring or indicating part would not be practical or necessary to carry out its primary function—to make or break circuits after a predetermined amount of time has elapsed.[9] Although most of the devices found to be time switches in the above cited cases had dials and were generally calibrated to perform some function at the time of day that the user desired, the rulings in those cases were not intended to limit paragraph 368(a) solely to devices that possessed those characteristics.

This Court finds that TSUS item 715.62 covers a range of time switches that at a minimum must make or break an electric circuit automatically upon the completion of some preset time interval. The Court must next determine whether the provision for time switches under TSUS item 715.62 is broad enough to bring the subject imports fairly within its scope.

### DEFROST CONTROL TIMERS

At trial, five different models of the subject defrost timers were received in evidence as plaintiff's exhibits 1 through 5. Plaintiff's exhibit 6 was received in evidence to represent a defrost timer which had been unassembled to reveal its internal mechanism. A witness for plaintiff, Mr. Thomas C. Anell, a manager of electrical design for Admiral, described the components and operation of the subject defrost timer as follows:

it consists of a [plastic] switch case . . . the housing, and a cam . . . which is circular . . . and the switch blades and contacts. . . . [W]hen the cam is turned by the gear train, which is attached to the subsynchronous motor, . . . it forms the driving motor that operates the cam. And as the cam turns, these electrical contacts on the blades will . . . [make] a circuit[ ]. . . . In this case the upper two

9. To be sure, had the drafters of paragraph 368(a) used the preposition "after" instead of "at" in the phrase "at a predetermined time," this would be an easier case; a provision requiring circuit making or breaking "after" a predetermined time would seem to more clearly describe the nature of the switching function in the subject merchandise, which occurs *following* a predetermined time *interval* of six or eight hours. The meaning of "time" or "times" in the language "predetermined time or times" is less troublesome for the Court. Time is "[t]he measure of duration. The word is expressive of both a precise *point* or *terminus* and of an interval between two points." *Black's Law Dictionary* 1329 (5th ed. 1979). In any event, this Court holds elsewhere in this opinion that Congress's choice of the language "at a predetermined time or times" or "at given times" is sufficiently broad to encompass the primary function of the subject merchandise.

blades are in contact. And, as it proceeds through the cycle and drops off of the cam, the lower set of contacts are now made and the upper circuit is broken. So, over a period of time, the cam will advance based upon accumulated compressor run time. And in this mode right now, the upper set of contacts would provide energy to the compressor circuits. And as we approach the time when we have accumulated the full amount of compressor run time the cam will allow, ... the blades drop off the lobe of the cam and will now switch to the heater circuit being made and [the] compressor circuit being open.

Trial Transcript (Tr.) at 37–38.

Another witness for the plaintiff, John Cable, testified that the electric circuit making or breaking function of the defrost timer occurs not at predetermined or preset times of the day, but rather at "variable times, depending upon such factors external to the defrost timers as room ambient, humidity, desired temperature within the refrigerator and usage of the refrigerator in terms of number of door openings." Tr. at 102. Plaintiff's witness further testified that "[a]lthough the accumulated compressor run time will always be a set six or eight hour period, the circuits made or broken enabling the compressor to cycle will be variable, resulting in widely variable intervals depending upon the factors mentioned before." Id. at 103.

The only defense witness called to testify at trial was Robert A. Heinzen, an expert in areas of defrost systems, synchronous motors, and components of electrical motors. He described the merchandise as follows:

The defrost timer is an electrical switch that is controlled by a synchronous motor. A rotating shaft attached to the rotor in the motor drives a series of gears that connect to a cam. After a predetermined interval, as measured by the rotation of the rotor, the cam causes the switch, which is equipped with electrical contact points, to open and close electric circuits that connect a compressor and a radiant heater.

Id. at 125. The concurrent switching function just described occurs after the motorized gear-to-cam mechanism within the defrost timer has measured or "accumulated" six or eight hours of actual compressor run time, depending upon the particular model. Id. at 126. Upon completion of the compressor run cycle, a defrost heater will be activated and run for twenty-one or twenty-three minutes of straight time, again depending upon the model.[10]

The defrost timer measures real time while the compressor is actually running. Tr. at 130. This is illustrated by the interaction between the major components of the cooling and defrosting system of a refrigerator. Between the compressor and the refrigerator's power source is a thermostat, also referred to by plaintiff as the temperature control, which is separate from the defrost timer and is used to maintain refrigerator temperature. Tr. at 43–44.[11] This thermostat contains an electric switch that closes a circuit providing electric current through that closed switch to the defrost timer when the thermostat calls for cooling. At this point, the motor of the defrost timer is energized, operating a gear train which turns the cam; simultaneously, the compressor is running. Tr. at 46. The cam, which operates in conjunction with the running of the compressor, measures real time so that if one could observe the cam's

---

10. Admiral identifies each defrost timer by a model number which indicates the *aggregate* amount (in hours) of compressor run time, followed by the length (in minutes) of straight time that the defrost heater will operate as measured by the defrost timer. For example, plaintiff's exhibit 2 is designated TMDE 621ZA9. The "621" means six hours of compressor run time and twenty-one minutes of defrost time. Similarly, plaintiff's exhibit 3 is designated TMDE 823 VB9, indicating eight hours of compressor run time and twenty-three minutes of defrost time. *See* Tr. at 85–86.

11. Plaintiff appears to argue that the presence of a thermostat makes the subject defrost timer more temperature-controlled than time-controlled. The Court need not reach that question, particularly since the Brussels Nomenclature recognized that time switches can be activated by thermostats. *Brussels Nomenclature, supra,* at 1111–12.

position at a particular point in the cycle, one presumably could see how much longer the compressor would run before six or eight hours have elapsed. The result would be a switching function by the defrost timer.[12] Since the cam's rotation is interrupted whenever the thermostat signals the compressor (via the defrost timer) to stop, the observer in the above hypothetical would not be able to determine how much time remained in the cooling *cycle.* In essence, the thermostat determines *when* and *how often* the compressor runs, but the defrost timer measures *how long* the compressor has actually run and performs a switching function at the end of the aggregate six or eight hour interval.

The subject defrost timers measure time both indirectly and directly. They determine time indirectly by measuring how long the compressor itself has actually run. The timers perform a switching function after a component other than itself, the compressor, has run for a length of time preset by the manufacturer—six or eight hours varying by model. From this perspective, the defrost timer is not directly measuring time, but instead is "timing" how long something else is actually operating and performs the requisite switching function when that timing function is complete. When the refrigerator is in the defrost cycle, the defrost timers measure time directly. At the end of the cooling cycle, the defrost timer automatically activates (switches on) a defrost heater, then measures off a continuous twenty-one or twenty-three minutes of straight clock time, after which the defrost timer automatically deactivates (switches off) the heater.

Defendant's example of a basketball clock is analogous of what the defrost timer is designed to accomplish.[13] Mr. Heinzen testified on this point as follows:

> While the defrost timer will measure the amount of time the compressor is running, the clock will measure the amount of time the ball is in play. When the ball is not in play, the clock will not run. The clock thus measures a predetermined or given amount of time the ball is in play, as for example, 60 minutes, and then signals the end of the game. Although the game from beginning to end might take two or three hours to complete, the clock will measure a predetermined or given amount of playing time. Similarly, the defrost timer will measure a predetermined or given amount of time that the compressor is in operation.

Tr. at 131.

■ Nothing in the record or authorities cited leads this Court to conclude that Congress intended time switches to carry the restrictive and technical definition which plaintiff attaches. If the Court were to adopt plaintiff's definition of a time switch under TSUS item 715.62, then any device that makes or breaks an electric circuit after it measures an *interval* of time predetermined by the manufacturer, standing alone, could not be a time switch. As discussed herein, the Court finds that Congress did not contemplate that time switches tell the time of day, have dials, operate continuously without interruptions, and be set by the consumer to operate at clock times. Presumably, some time switches require those characteristics to carry out their intended functions. Nevertheless, the defrost control timers in their present condition satisfy the principal requirements for time switches found in the *Tariff Classification Study*, the *Brussels Nomenclature*, and in paragraph 368(a) of the Tariff Act of 1930. They make or break electric circuits after they have mea-

---

**12.** Defendant's witness Heinzen on cross-examination testified that the defrost timer could, with other information, operate as a "crude clock," allowing one to determine the time of day by observing the relative position of the cam to the mark on the case. Tr. at 149.

**13.** Although such a device is not before this Court, a basketball clock does not seem to fit

within the TSUS provision for time switches. As set forth in the testimony of Mr. Heinzen, the only witness for the defendant, a basketball clock does not make or break electric circuits "automatically." It does so only through human intervention, *i.e.,* a timekeeper. The defrost timers before the Court make or break electric circuits automatically.

sured a specific time interval as predetermined by the manufacturer.

The fact that the switching function of the defrost timer may occur at various times of the day does not mean they are not time switches. Given the purpose for which the defrost timers are designed and used, the time of day that the switching function occurs is apparently irrelevant. The respective lengths of time that the compressor and the defrost heater operate are, conversely, quite relevant and accordingly predetermined by the manufacturer. It is the function of these defrost timers to measure these time intervals and perform some function afterwards. Simply because the consumer cannot alter these time intervals does not make the defrost timer something other than a time switch.

Nor does the discontinuous nature of the cooling cycle remove the defrost timers from inclusion as time switches under TSUS item 715.62. The Court finds it difficult to imagine that Congress intended to exclude devices from the meaning of time switches which are designed to allow for variables during the course of their timing cycles. In the instant case, as discussed, a thermostat is responsible for breaking the continuity of the cooling cycle. As noted, the *Brussels Nomenclature* recognizes that time switches may be activated by thermostats.

The Court holds plaintiff has failed to overcome the presumption of correctness which attaches to Customs' classification. Accordingly, the Court finds the subject imports were properly classified by the defendant as time switches under item 715.-62, TSUS. Therefore, it is unnecessary to decide whether the imports are electrical switches under defendant's alternative classification, TSUS item 685.90. Further, Headnote 1(v) of Part 4 of Schedule 6 of the Tariff Schedules of the United States (1984) requires that this Court reject plaintiff's claimed classification of defrost timers as parts of refrigerators or refrigerating equipment under TSUS item 661.35, because these devices are more specifically provided for under the *eo nomine* provision for time switches.

### CONCLUSION

On the basis of the foregoing, this Court holds plaintiff has failed to overcome the presumption of correctness attached to Customs' classification. The imports were properly classified under TSUS item 715.62 as time switches. This action is dismissed.